*cc: LEK, filed*

ORIGINAL

KENNETH L. LAWSON
3362 Loulu Street
Honolulu, Hawai'i, 96822
Phone: 808-542-7978
Email: Kenlawdog@gmail.com

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

AUG 2 1 2023

at 9 o'clock and 15 min. AM
Lucy H. Carrillo, Clerk

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAI'I

| | |
|---|---|
| KENNETH L. LAWSON,<br><br>   Plaintiffs,<br><br>  v.<br><br>UNIVERSITY OF HAWAI'I, MĀNOA;<br>MICHAEL BRUNO;  CAMILLE<br>NELSON; JOHN AND JANE DOES 1-7<br>WILLIAM S. RICHARDSON SCHOOL<br>OF LAW FACULTY MEMBERS<br>AND/OR FORMER FACULTY<br>MEMBERS AND IN THEIR<br>INDIVIDUAL CAPACITIES,<br><br>   Defendants. | CIV. NO. CV 23   00348 LEK RT<br><br>COMPLAINT; EXHIBITS "A" – "R";  KU<br>SUMMONS       J<br><br>(1)  42 U.S.C. 1983 – FIRST<br>   AMENDMENT<br><br>(2)  DECLARATORY RELIEF<br><br>(3)  CONSPIRACY TO VIOLATE<br>CIVIL RIGHT: 42 U.S.C. §1985<br><br>(4) NEGLECT TO PREVENT<br>VIOLATION OF CIVIL RIGHTS: 42<br>U.S.C. §1986<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff KENNETH L. LAWSON ("Professor Lawson") for a Complaint against the above-named Defendants, alleges and avers as follows:

## **INTRODUCTION**

This factual summary provides the relevant background information necessary to understand why Professor Lawson is being forced to file this Complaint and to provide context to the retaliatory actions that Defendants have taken against Professor Lawson prior to the filing of this Complaint. Defendants are using the University of Hawai'i's ("U.H.") hostile workplace and other policies as a pretext to retaliate against Professor Lawson for filing a discrimination complaint against Defendants U.H., Provost Michael Bruno ("Defendant Bruno") and William S. Richardson School of Law ("W.S.R.S.L.") Dean Camille Nelson ("Defendant Nelson") and for Professor Lawson accusing W.S.R.S.L. Defendant Nelson and other W.S.R.S.L. Faculty Members of engaging in unconscious racial bias surrounding a W.S.R.S.L. sponsored Black History Event.

To understand the background of this Complaint for the recent retaliation and discrimination, it is important to address the ongoing discrimination and retaliation that the Defendants have been engaged in over prior years. The discriminatory treatment of Professor Lawson began when he raised issues of U.H. and

W.S.R.S.L.'s faculty classification system which denied Professor Lawson and other W.S.R.S.L. faculty members equal pay for equal work. Professor Lawson filed a grievance with U.H. and W.S.R.S.L. about their faculty classification system, alleging that U.H. and W.S.R.S.L. abused the dual faculty classification system, which categorizes W.S.R.S.L. faculty as either 9 month J-Faculty or 11-month S-Faculty. J-Faculty who are systematically paid substantially larger salaries than S-Faculty. J-Faculty at W.S.R.S.L. are instructional faculty whose job duties include classroom teaching, legal scholarship, and community service. By comparison, U.H. and W.S.R.S.L. define the duties of S-Faculty as "faculty [that] are hired to do a range of activities that are directly related to student success and/or highly specialized activities where the focus tends to be outside the classroom, but with direct impacts for programs across the system." Professor Lawson found that W.S.R.S.L. and U.H. intentionally and wrongfully misclassified Professor Lawson as S-Faculty in order to pay him substantially less than the minimum hiring criteria and assigned job duties demanded. Professor Lawson was specifically hired and then required to perform the job duties of a retiring J-Faculty member whose primary responsibilities had been to teach Criminal Law, Legal Writing, and serve as the Director of the Hawaiʻi Innocence Project legal clinic. Additionally, because W.S.R.S.L. was understaffed at the time Professor Lawson

3

was hired, he was also assigned the teaching load of two other J-Faculty members, thereby not only teaching the courses that his retiring J-Faculty predecessor taught (Criminal Law and the classroom component of the Hawai'i Innocence Project Clinic) but also additional bar courses that other J-Faculty members had been teaching, including Criminal Procedure, Evidence, and Professional Responsibility. Professor Lawson was told that although he was being classified S-Faculty, he would be paid equitably based on his hiring criteria and assigned job duties at W.S.R.S.L.

Despite U.H. and W.S.R.S.L. improperly classifying Professor Lawson as S-Faculty even though he was assigned J-Faculty responsibilities, Professor Lawson has performed above and beyond the level to which expectations his J-Faculty peers are held. Professor Lawson has taught more law courses, had more students sign up for those courses, counseled more students, and achieved more objectively measured success as a classroom teacher than any member of W.S.R.S.L.'s J-Faculty. For example, the first year he was eligible, in 2017, Professor Lawson was awarded the Board of Regents' Teaching Medal of Excellence, the highest teaching award U.H. confers on any professor. Additionally, U.H. granted Professor Lawson tenure in 2019 based on the unanimous recommendations of W.S.R.S.L. and campus-wide tenure-review committees that had relied on criteria

and standards applicable to J-Faculty despite his misclassification as S-Faculty
(excellence in classroom teaching, legal scholarship, and community service).
Notwithstanding the fact that Professor Lawson was granted tenure based on J-
Faculty criteria, Professor Lawson's salary has never reflected the J-Faculty job
duties that he performed; thus, his salary for many years remained dramatically
lower than the average J-Faculty salary.

Professor Lawson became aware of this discriminatory and disparate
treatment only when he saw on Civil Beat a salary database of all state employees.
Only then did Professor Lawson learn that despite being told he had been hired and
would be paid equitably, based on the J-Faculty duties that he was assigned, he
was, in fact, being paid substantially less than every J-Faculty member at
W.S.R.S.L. and even paid less than many of the S-Faculty as well. ***See 2021
Workload and Salary Chart attached to this Complaint as Exhibit A.*** This chart
illustrates the disparity in teaching loads and salaries of the J-Faculty and S-
Faculty members at W.S.R.S.L. and clearly shows that the vast majority of J-
Faculty teach far less than the theoretically required 12-16 credit hour teaching
load for J- Faculty at U.H., yet have always been paid significantly more than
Professor Lawson, whose assigned teaching load has greatly exceeded the
theoretically required amount. This chart also shows that U.H. and  W.S.R.S.L.

expend a substantial portion of tuition funds on J-Faculty who regularly teach far less than the theoretically required 12-16 credit hours annually. In order to cover the classroom courses that J-Faculty members are not teaching, taxpayer dollars and student tuition has regularly been spent on hiring low-cost, part-time adjunct instructors. This chart clearly shows that J-Faculty are paid enormous salaries for embarrassingly limited instructional duties, and that very few J-Faculty at W.S.R.S.L. meet the minimal teaching requirements. In comparison, Professor Lawson, despite having been improperly classified as S-Faculty, has regularly taught 30 to 40 credit hours annually while his J-Faculty colleagues have been permitted to teach 6 to 12 credit hours annually. Despite teaching more credits annually and having been found by U.H. and W.S.R.S.L. tenure committees to be doing so successfully, Professor Lawson has been classified and treated like a second-class faculty member, which is not what he was promised or had reason to expect. Despite teaching more courses and more students (and arguably doing so more successfully), he has consistently been paid approximately $60,000 less than similarly situated faculty at W.S.R.S.L.

In addition to teaching more instructional credits than his J-Faculty colleagues, Professor Lawson has long served as Co-Director of the Hawaiʻi Innocence Project ("H.I.P.") legal clinic. Professor Lawson supervises the students'

education in the H.I.P. clinic as they work on cases with volunteer attorneys where the client appears to have been wrongfully convicted. W.S.R.S.L. law students are required to enroll in legal clinics in order to graduate, and under Professor Lawson's leadership the H.I.P. clinic has been one of the most popular clinics at W.S.R.S.L. In 2022, Professor Lawson also helped develop a new legal clinic, Beyond Guilt Hawaiʻi, which allows W.S.R.S.L. students to work on clemency, parole, and compassionate release for inmates currently serving lengthy and arguably unjust sentences. Despite the fact that students are required to enroll in legal clinics in order to graduate, and Professor Lawson's two clinics represent indigent clients, Professor Lawson has been told by Defendant Nelson that student tuition funds cannot be used to support the work of these clinics and that Professor Lawson must raise extramural funds to support the clinics including the salary of his Associate Director, Jennifer Brown. To Professor Lawson's knowledge, his two clinics are the only clinics at W.S.R.S.L. that require extramural funds to be raised to run the clinic and pay faculty salaries. Despite this daunting requirement, H.I.P. has been awarded over $1.5 million in federal grants under Professor Lawson's leadership. Additionally, Professor Lawson has raised private donations for both clinics and has been awarded state grants through the Hawaiʻi Justice Foundation annually. Despite the millions of dollars that Professor Lawson has secured on

7

behalf of Defendants U.H. and W.S.R.S.L. through grants and private donations while successfully carrying the above-described teaching load, Professor Lawson has never received a merit or an equity raise in all his years at W.S.R.S.L.

Over the last two years, Professor Lawson has asked U.H. and W.S.R.S.L to rectify this pay inequity and misclassification issues by bringing to light their complicit role in this unlawful and abusive discriminatory practice. Instead of rectifying the situation, U.H. and W.S.R.S.L. instead have retaliated in ways that have further violated his rights, including his First Amendment Right to free speech.

Professor Lawson was once a celebrated attorney who fell prey to addiction to opioids. This culminated in his permanent disbarment and imprisonment for obtaining prescription drugs by fraudulent means. To say he hit bottom professionally, financially, emotionally, or spiritually would only begin to describe his fall from grace. Professor Lawson will be eternally grateful for the help he received in rebuilding his professional life, including U.H. and W.S.R.S.L. decision to hire him. But that does not justify pay discrimination or retaliatory actions for speaking truth to power. Professor Lawson's virtuous rise as a law school professor is an exemplary 'come-back' story that has resulted in him becoming a highly sought-after classroom teacher and clinic director for his ability

to impart his legal expertise within the unique context of his life. In other words, his fall and recovery make him a very rare asset to the Law School. Unfortunately, life experiences that have helped him make him connect with students of all kinds, also present a seemingly insurmountable hurdle to his U.H. and W.S.R.S.L. decision-makers who evidently believe his past makes him permanently undeserving of the equal pay for equal work and job classification based on substance rather than arbitrary dictate.

Professor Lawson filed a grievance against U.H. in 2020 due to his improper classification and unequal pay. In May of 2022,  Professor Lawson entered into a settlement agreement with Defendants U.H., Provost Bruno, and Dean Nelson. Pursuant to the settlement agreement, Defendant U.H. acknowledged that the basis for the settlement was that Professor Lawson's base pay should have been increased when he was reassigned from Associate Director of H.I.P. to Co-Director of H.I.P. many years ago; and also because U.H. had failed to pay him for overload teaching during numerous years. Moreover, the settlement agreement specifically states in the section entitled Adjustments to Compensation that:

(a)    **…This increase to Employee's base pay is not due to the Special Salary Adjustment categories of Equity, Merit, or Market and it not subject to the special salary adjustment procedure.**

Since being employed at U.H., Professor Lawson has never received an equity or merit increase in salary. Defendant U.H. refused to raise Professor Lawson's salary based on equity during the settlement negotiations. Defendant Nelson and U.H. told Professor Lawson during the settlement negotiations that if he wanted an equity and merit increase, he must follow the procedures set out in the Collective Bargaining Agreement and file a Special Salary Adjustment ("S.S.A.") and let the W.S.R.S.L. Faculty vote on whether he should receive an equity and merit raise. After Professor Lawson reached a settlement with Defendants, he then filed an S.S.A. as Defendants U.H. and Defendnat Dean Nelson suggested. After reviewing and discussing Professor Lawson's S.S.A. request and supporting material, the W.S.R.S.L. faculty voted that he deserved both an equity and merit raise. But then, for the first time in W.S.R.S.L. history, Defendant Provost Bruno and Defendnat Dean Nelson denied a faculty member's S.S.A. request notwithstanding the W.S.R.S.L. faculty vote in favor of it. Not only did Defendants Nelson and  Bruno ignore the faculty vote and deny Professor Lawson an equity and merit raise, but in so doing, they falsely claimed the settlement had already covered the S.S.A. categories of merit and equity. They did this despite the language in the agreement quoted above which clearly states otherwise. In February of 2023, Professor Lawson filed a grievance against

Defendants Bruno and Nelson and a complaint against them with the Hawai'i Civil Rights Commission1 ("H.C.R.C."), alleging discrimination and breach of the settlement agreement. The complaints were filed on February 10 (Grievance) and February 11, 2023 (H.C.R.C. complaint). Just a couple of weeks later, as discussed below, Defendants Bruno. Nelson and others launched an investigation against Professor Lawson, claiming that he created a hostile work environment when he spoke at a faculty meeting about the Law School's D.E.I. committee hosting a racially insensitive Black History event and he later used the Law School listserv to announce a Boycott of the event.

## Complaints of Discrimination, Protest, and Boycott

While Professor Lawson's Grievance and H.C.R.C. complaints were still pending, in February 2023, W.S.R.S.L.'s Diversity, Equity, and Inclusion ("D.E.I.") committee sent out a flyer announcing a Black History program for this February's Black History Month on the U.S. Black Civil Rights Movement and Dr. King's *Letter from the Birmingham Jail*. **Attached as Exhibits B and C.** For reasons never explained, The D.E.I. Committee chose not to have any Black law students, Black civil rights attorneys, Black activists or any other Black members of the community to serve as a panelist or facilitator. One can only imagine the

---

1 Professor Lawson's Hawai'i Civil Rights Commission Charges of breach of settlement and discrimination against Bruno and Nelson is currently set for mediation with U.H. on 9-11-23 at 9:00 a.m.

uproar it would create if W.S.R.S.L. colleagues tried to stage a program on Native Hawaiian activism without including a Native Hawaiian on the panel, or a program on antisemitism without including a single Jewish person, or on AJA in Hawai'i without including any AJAs. It could only be imagined for a very simple reason: It has never happened, nor will it ever happen.

At the next faculty meeting, on February 17, 2023, Professor Lawson raised his hand during the open-forum part of the meeting and was recognized by Defendant Nelson, who gave Professor Lawson the floor to speak. When he began speaking, he asked the D.E.I. Committee why no Black people were on the panel or asked to facilitate the event. He explained that failing to include anyone of Black ancestry in the event was an example of unconscious racial bias. Professor Lawson, who lived through and taught classes on the history of the U.S. Black Civil Rights Movement and why specifically Dr. King was in Birmingham, tried to explain why the D.E.I. committee's exclusion of Blacks was a form of "Nice Racism," but was repeatedly interrupted by Defendant Dean Nelson, each time saying, "Ken, we made a mistake." Eventually, she added, "as a Black woman, I can understand [discrimination and racism]." Professor Lawson, who had been repeatedly interrupted while trying to describe the physical beatings and discrimination his parents and other family members had endured, eventually

pointed out that Defendant, Dean Nelson, had been born and raised in Jamaica and Canada, and therefore she and her family may not have personally experienced the U.S Black Civil Rights Movement, Jim Crow segregation, or forced bussing desegregation. Professor Lawson never said that Defendant Dean Nelson had not experienced racism or discrimination but simply pointed out that she didn't grow up in the U.S. Black Civil Rights movement, which is what the Black History Month event was supposed to be about. Again, he pointed this out in the context of Defendant Dean Nelson's repeated efforts to prevent Professor Lawson from explaining his objections to the D.E.I. committee's exclusion of Blacks. Shortly after that, a white female faculty member said she did not view the event as racist because even though there were no Black panelists or facilitators, Black people could attend the event and participate. Professor Lawson responded by telling her that her statement was yet another example of "Nice Racism," an academic term for unconscious racial bias. Professor Lawson named the scholar and acknowledged expert, Robin DiAngelo, who originally coined the phrase. Defendant Nelson acknowledged that she was familiar with DiAngelo's work on unconscious racial biases.

After Professor Lawson finished speaking at the faculty meeting, two meeting attendees apologized to him for the pain W.S.R.S.L. had caused him and

Black law students. Over the days immediately following the meeting, colleagues texted and emailed Professor Lawson showing support for his position. After Professor Lawson spoke, the meeting moved on from the announcement portion to the hiring of new faculty portion of the meeting. At that time, Defendant Nelson asked if all of the faculty was ready to move on to that part of the meeting, and everyone said yes or otherwise indicated they were ready to continue the meeting. No one said they could not do their job because of anything Professor Lawson had said or the way he said it. The entire faculty meeting lasted another 4 to 5 hours. No one left the meeting while Professor Lawson was speaking or later because of Professor Lawson's speech and no one accused him of name-calling or inappropriate behavior, at least not during the meeting. Similarly, no one suggested that Professor Lawson needed to calm down or said that they felt threatened.

The Notice of Investigation attempts to (in classic implicit racial bias form) portray Professor Lawson as the angry and dangerous Black man who was in a rage, yelling, screaming, and threatening people in a meeting. The evidence, in real time, shows otherwise. One student who attended the meeting felt the pain and hurt that this act caused Professor Lawson. When she was asked to speak at the meeting, she tearfully offered Professor Lawson her condolences for the pain and hurt the Law School had caused him. Another faculty member who was member of

the D.E.I. committee, was given a chance to speak at the meeting, and she too apologized to Professor Lawson and said she was sorry for the pain this event had caused. During the meeting, another faculty member texted Professor Lawson and said, "I'm sorry the Law School hurt you again."  Another email from a colleague said this about Professor Lawson's speech during the faculty meeting: *"Thank you for sharing this email and for your mana'o on Friday.  These painful truths and experiences are what is often missing when talking about what has happened in the past and I thank you for sharing.  The stories you've shared about your life, I've never heard.  But I could feel your deep pain."*

The next day, February 18,  Professor Lawson emailed Defendant Dean Nelson and the D.E.I. committee members, a copy of which is attached as **Exhibit D**. Hours after sending that email, Professor Lawson attended a Black History film festival event with his wife at the Doris Duke Theatre in Honolulu. Defendant Dean Nelson was in attendance as well. While walking down the aisle, Defendant Dean Nelson greeted Professor Lawson, who was already seated next to his wife. Defendant Nelson bent over, touched Professor Lawson on the shoulder, and asked him how he was doing. After Professor Lawson responded, Defendant Nelson then reached over Professor Lawson, extended her hand, and introduced herself to Professor Lawson's wife.

After Professor Lawson received no response to his February 18 email, on Tuesday, February 21, 2023, Professor Lawson used the Law School listserv to call for a Boycott of the event that was still scheduled to proceed on Thursday, February 23, 2023. *Attached as Exhibit E.* It was not until Professor Lawson called for a Boycott that the D.E.I. committee finally responded to Professor Lawson, circulating a "gaslighting" memo *(Exhibit F)* on the listserv that portrayed themselves as victims. They did not acknowledge or apologize to Professor Lawson or the Black law students who had joined in the boycott. For the first time, the D.E.I. committee was now framing the event as a "book club" event that the D.E.I. committee had now decided to cancel rather than invite Professor Lawson, Black students, or any other Black person to participate in the event.. Several faculty members also responded to the listserv posts with emails and a memo calling for new faculty meeting rules. One email said Professor Lawson "could cause a hostile work environment."

That following Monday, February 27, 2023, Defendant Provost Bruno, rather than the U.H. Equal Employment Opportunity office, sent Professor Lawson a "Notice of Investigation" to determine if his speech and behavior at the February 17, 2023 faculty meeting and his subsequent use of the listserv to call for a Boycott of the event had created a hostile work environment. The Notice of Investigation

16

banned Professor Lawson from the W.S.R.S.L. campus indefinitely, chilled Professor Lawson's speech on the issues of race discrimination at the W.S.R.S.L. and U.H., violated his First Amendment right to free speech using the listserv and was an early step in what now appears to be clear retaliation for Professor Lawson's above-described words and actions.

As a Civil Rights Activist, Professor Lawson believes he has a special responsibility to share with interested law students the importance of using the law to fight against systemic racism and discrimination. Self-proclaimed liberal and activist W.S.R.S.L. professors claim to respect the First Amendment rights of others in protesting racial discrimination but on this matter *some* of them appear not to think that applies to Blacks in Hawai'i. However, none of the Defendants in this case respected Professor Lawson's right to speak and to Boycott. These self-appointed race warriors, in some cases, are apparently shocked at the suggestion THEY could have done something racist, even if it was "Nice Racism." Others on the faculty have been supportive of Professor Lawson, but only privately, presumably, because they do not want to be "canceled" the way our self-ordained race warrior colleagues have tried to "cancel" Professor Lawson. The term "cancel" includes being falsely accused of creating a hostile work environment and being banned from the campus.

Knowing that Professor Lawson had already filed a credible grievance and complaint against Defendants Provost Bruno and Dean Nelson for discrimination and breach of the settlement agreement, Defendant Bruno did not allow this investigation to go through the U.H. E.E.O. office or the U.H. Title IX office as would normally be the proper procedure. Instead, Bruno appears to be personally overseeing the investigation. Among other questionable actions by Defendant Provost Bruno, he appointed Dean Johnathan Osorio as the "Decision Maker" in Professor Lawson's investigation. If this investigation was intended to be fair and impartial, Dean Osorio should never have been appointed and now empowered as Decision Maker in Professor Lawson's investigation, because Dean Osorio is biased in favor of both Bruno and Nelson based on his personal history between them.

Beginning more than two years ago,  Defendants Provost Bruno, Defendant Dean Nelson, along with Dean Osorio, have testified together at the State Legislature, seeking State funding to establish Hoʻokaulike, a Criminal Legal System Institute for Restoration and Healing ("the Institute") which, once created, would be a joint project between Dean Osorio and Defendant Dean Nelson and housed at W.S.R.S.L. where it would overlap with Professor Lawson's clinics and compete with them for tightly limited space, students and resources. Attached as

Exhibits G, H, and J are the joint written testimonies of Defendants Bruno and Nelson along with Dean Osorio.

Many of the Institute's objectives overlap directly with the Beyond Guilt Legal Clinic that Professor Lawson founded several years ago and the law faculty subsequently approved as a permanent clinic. Defendants Provost Bruno, Dean Nelson, and Dean Osorio have jointly been seeking funding from the State at exactly the same time that Professor Lawson filed complaints against them and is being "canceled" and banned from the Law School. Defendants Provost Bruno, Dean Nelson, and Dean Osorio know their sought-after Institute would compete directly with the Beyond Guilt Clinic in mission and with both of Professor Lawson's clinics for space and other limited resources. It is also telling that none of their written testimony mentions Beyond Guilt or the Hawaii Innocence Project. In any event, all three, Defendants Provost Bruno, Defendant Dean Nelson, and Dean Osorio would benefit if Professor Lawson is permanently removed from the law school as that would suddenly create the space and other resources needed for the Institute that Dean Osorio, Defendant Provost Bruno and Defendant Dean Nelson support.

Moreover, if the legislature passes this bill, in its current form, it would provide over a million dollars in annual funding that would benefit Dean Osorio

and Defendant Dean Nelson directly. This creates a clear conflict and perhaps

describes a conspiracy to remove Professor Lawson and his clinics. Yet, Defendant

Provost Bruno has repeatedly denied Professor Lawson's request/demand to have a

neutral Decision-Maker assigned to this investigation. Dean Osorio has a clear bias

and has demonstrated favoritism toward Defendant Dean Nelson, presumably

because of their joint mission of securing substantial funding from the legislature

and space at the Law School for their Institute. Although it was Defendant Dean

Nelson who brought the Investigation against Professor Lawson, Dean Osorio

would benefit equally from issuing a finding in Defendant Nelson's favor in this

investigation, based on their connected history and need to work together to see

that their Institute is funded. At the time Defendant Bruno appointed Dean Osorio

as the decision-maker in Professor Lawson's case, Defendant Bruno knew that he,

Defendant Nelson, and Dean Osorio were working together to seek legislative

funding for their U.H. Institute and knew of the potential bias that Dean Osorio

would have for Dean Nelson and against Professor Lawson, but appointed Dean

Osorio as decision-maker anyways. This suggests that this investigation was never

fair nor impartial, that it is a pretext for an effort to cancel Professor Lawson and

replace his clinics with the Institute, and that a reasonable person could argue that

this unique and unusual investigative process reeks of fundamental unfairness and

due process violations, in addition to being retaliatory for Professor Lawson filing complaints against Defendants Provost Bruno and Dean Nelson and for Professor Lawson exercising his First Amendment right to free speech.

Finally, investigations are not supposed to take longer than 90 days. Professor Lawson's banishment from the W.S.R.S.L. campus is now at 6 months, with no end on when the "investigation" will be complete. Over the last two months, Professor Lawson has sought permission to work in his W.S.R.S.L. office on the weekends and other odd hours when none of the complaining faculty members are there. This reasonable accommodation was denied. Professor Lawson then offered to go in at 10 pm at night and leave before 6 am to work in his W.S.R.S.L. office where confidential client files are necessarily stored. This reasonable accommodation was also denied. This has been a huge inconvenience for Professor Lawson and his students. In addition to directing two active-client clinics, Professor Lawson teaches courses students must take to pass the bar exam, including Evidence, Criminal Law, Criminal Procedure, and Professional Responsibility. Due to the Defendant's banning him from campus while the investigation is ongoing, Professor Lawson has been forced to teach his classes online, which is less than ideal. Professor Lawson asked Defendants if he could teach his course in person if the Associate Dean of Academic Affairs or someone

from U.H. security met him at the W.S.R.S.L. property line, walked him to class, and then, immediately after each class ended, escorted him off W.S.R.S.L. property. Defendants also denied this request.

1.  This is a civil action wherein Professor Lawson seeks injunctive and other relief to restrain Defendants from violating his First and Fourteenth Amendment rights, including academic freedom, by retaliating against him by summarily banning him from the Law School campus, chilling his right to free speech on matters of public concern and forbidding him from using the William S. Richardson School of Law ("W.S.R.S.L") at the University of Hawai'i at Mānoa ("U.H.") listservs to communicate and make announcements.

2.  As recognized by the Supreme Court of the United States: "[s]peech by citizens on matters of public concern lies at the heart of the First Amendment, which was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Lane v. Franks,* 573 U.S. 228, 235 (2014) (internal quotations omitted).

3.  This constitutional right to freedom of speech also protects individuals who are employed by governmental entities: "public employees *do not renounce their citizenship* when they accept employment, and this Court has cautioned time and again that public employers may not condition employment on the

relinquishment of constitutional rights." *Id.* (italics added).

4.      The United States Constitution embraces a heated exchange of views especially concerning sensitive topics like race, where the risk of conflict and insult is high. Without the right to stand against society's most strongly-held convictions, the marketplace of ideas would decline into a boutique of the banal, as the urge to sensor is greatest where debate is most disquieting and orthodoxy most entrenched. **The right to provoke, offend, and shock lies at the core of the First Amendment. This is particularly true on college campuses.** *Rodriquez v. Maricopa County Cmty. College Dist.* 9th Cir. Court of Appeals, 605 F.3d 703, 2009, (Emphasis added).

## JURISDICTION AND VENUE

5.      This action arises under the First and Fourteenth Amendments to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985, 1986, and 1988; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

6.      Specifically, Plaintiff seeks declaratory and injunctive relief against the official-capacity Defendant and a ruling that Defendants violated Professor Lawson's right to free speech and engaged in a process to unconstitutionally retaliate against Professor Lawson for speaking on matters of

public concern. Professor Lawson also seeks compensatory and punitive damages against the individual-capacity Defendants for conspiracy to violate Plaintiff's civil right to free speech.

7.       Accordingly, this Court has jurisdiction over these federal claims under U.S.C. §§ 1331 and 1343.

8.       Venue is proper pursuant to 28 U.S.C. §1391(b)(2) because Plaintiff's claims arise in this judicial district in the City and County of Honolulu, State of Hawai'i.

## PARTIES

9.       Plaintiff KENNETH L. LAWSON ("Professor Lawson" or "Plaintiff") is a tenured faculty member at the William S. Richardson School of Law ("W.S.R.S.L.") at the University of Hawai'i at Mānoa ("U.H.") where he is classified as a Specialist Faculty ("S-Faculty"), and was at all times relevant herein, a citizen of the United States and resident of the City and County of Honolulu, State of Hawai'i. Plaintiff's race is Black, and he is part of a protected class for purposes of 42 U.S.C. §1983 et. seq. civil rights laws. Plaintiff filed a complaint of retaliation against Defendant UH based on race with E.E.O.C. Plaintiff received his right to sue letter on June 7.

10.       Defendant UNIVERSITY OF HAWAI'I ("U.H.") is and was at

all times relevant herein, Plaintiff's employer and a Hawai'i state corporation existing under the laws of the State of Hawai'i. Defendant U.H. is a public university system with one of its ten general campuses, U.H. Mānoa, located in the City and County of Honolulu, State of Hawai'i. Defendant MICHAEL BRUNO ("Bruno") is, and was at all times relevant herein, employed as the Provost of the University of Hawai'i. He is a citizen of the United States and a resident of the City and County of Honolulu, State of Hawai'i. He is being sued in his capacity.

11.      Defendant CAMILLE NELSON ("Nelson") is, and was at all times relevant herein the Law Dean at the Defendant University of Hawai'i's William S. Richardson School of Law. She is a citizen of the United States and resident of the City and County of Honolulu, State of Hawai'i. She is being sued in her individual capacity.

12.      JOHN AND JANE DOES 1-7 ("Doe Defendants") are University of Hawai'i faculty persons or former faculty members or entities who may be liable to Plaintiff or may have an interest in the matter or issues pending, whose identities and capacities are presently unknown to Plaintiff. Plaintiff has been unable to ascertain whether all parties liable to Plaintiff are named herein. Plaintiff will identify such Doe Defendants when their names and capacities are ascertained. Plaintiff is informed and believes and thereon alleges that some of

25

these Doe Defendants are, and at all times relevant herein, were, in some manner

presently unknown to Plaintiff, engaged in and/or responsible for the acts and/or

omissions alleged herein.

## STATEMENT OF FACTS

### (Background)

13. Plaintiff incorporates the Introduction and paragraphs 1-12 as fully

rewritten herein and further states that in June of 2020, Professor Lawson filed a

grievance against the Law School for misclassification, backpay for teaching years

of overload without payment, and inequity in pay.

14.     The matter was settled with the specific understanding that UH

would pay Professor Lawson the years of back pay owed and because he never

received a pay raise when he was appointed the Co-Director of HIP with increased

responsibilities.

15.         UH told Professor Lawson at the time of settlement that

if he wanted to be paid to others similarly situated, he had to go through the

Collective Bargaining Special Salary Adjustment ("SSA") process and have the

Law School faculty review his work and vote on whether he should be given an

equity and merit raise.

16.     Professor Lawson did what UH said was required and filed for a

an SSA in June of 2022.   In the ten-plus years that Professor Lawson has been employed at the Law School, he never has received an equity or merit raise, even though he has taught more Law School courses, law students, and more credit hours than any other Law School. Yet, in 2021, he was paid substantially less. Moreover, he has brought in over 1.5 million dollars in grant funds and donations since being appointed Co-Director of the Hawai'i Innocence Project.

17.   The Law Faculty reviewed Professor Lawson's request for an equity and merit raise and the majority of the voting faculty voted to give him both a merit and equity raise.

18.   For the first time in the history of the Law School, the Law Dean denied the Faculty's request to give Professor Lawson an equity and merit raise.

19.   Defendant Bruno agreed with the Law Dean and denied Professor Lawson's SSA request, claiming that it had been covered by the settlement, knowing that the settlement specifically states that the settlement does NOT cover the SSA categories of equity and merit. Burno and Nelson knew the settlement did not cover the SSA Process because they both signed it.

20.   On February 10, 2023, Professor Lawson filed a grievance against Defendants Bruno and Nelson, alleging breach of the settlement agreement and discrimination.

27

21.     On February 11, 2023, Professor Lawson filed a complaint of

discrimination against Defendants Bruno and Nelson with the Hawaiʻi Civil Rights

Commission.

22.     While Professor Lawson was forced to file a complaint and

Grievance against Bruno and Nelson, the two Defendants were testifying jointly

with U.H. Dean, John Osorio at the State Legislature seeking funding for an

Institute to be housed at the Law School.

23.     For the last two years, Provost Bruno, Dean Nelson, and Dean

Osorio has been testifying at the State legislature requesting State funding to

establish Hoʻokaulike, a Criminal Legal System Institute for Restoration and

Healing ("the Institute") at the University of Hawaiʻi, William S. Richardson

School of Law. Many of the Institute's objectives overlap with the Beyond Guilt

Legal Clinic that Ken founded a couple of years ago and the Law Faculty

subsequently approved as a Permanent Clinic.

24.     As outlined below, just a few weeks later, in February,

Defendants Bruno, Nelson, and Jane/John Does retaliated against Professor

Lawson for filing his complaints of discrimination and for his calling for a Boycott

of a Black History Event, as described more fully in the paragraphs below.

25.     Defendants claim that Professor Lawson caused a hostile work

Environment resulted from his speaking and teaching on how the Law School's DEI committee engaged in implicit racial "unconscious" bias in having a Black History event without having all non-Black facilitators and for using the Law School Listserv to make a public announcement and call for a Boycott.

26.     On February 27, 2023, Professor Lawson received a Notice of Investigation accusing him of causing a hostile work environment for his speech at the meeting and using the Listserv to call for a Boycott.

27.     The Notice was from Bruno, who took it upon himself to personally oversee this process of the person who had recently filed a complaint for discrimination and breach of contract against him.

28.     In personally overseeing the investigation of Professor Lawson, Bruno appointed Dean Johnathan Osorio as the "Decision Maker" in the case to decide Professor Lawson's fate.

29.     Professor Lawson requested that he be given a neutral and fair Decision Maker pursuant to UH policy.

30.     Defendant's have created an investigative process that is designed to retaliate against Professor Lawson for exercising his right to free speech and complaints to his employer of race discrimination.

31.     The William S. Richardson School of Law ("W.S.R.S.L.") has a

rich history of hosting presentations for its students and the public on numerous matters of public interest, including racial, environmental, and cultural concerns. Throughout the years, W.S.R.S.L. has hosted events on Native Hawaiian Rights, Japanese American Civil Rights, Jewish American Civil Rights, and LGBQT+ civil rights.

32.    W.S.R.S.L. prides itself on being culturally and ethnically diverse.[2] Additionally, W.S.R.S.L. has employed scholars such as Mari Matsuda and Charles Lawrence who developed Critical Race Theory, and presently employs Dean Nelson who also considers herself a critical race scholar.[3] Additionally, W.S.R.S.L. employs scholars such as Justin Levinson whose research involves Implicit Racial Bias.[4]

33.    W.S.R.S.L. prides itself in being progressive in fighting against racial and cultural injustice. Moreover, W.S.R.S.L.'s Diversity, Equity, and Inclusion Committee ("D.E.I.") is tasked with ensuring diversity and racial equality flourish at W.S.R.S.L.

---

2 *Richardson among "Best Law Schools for 2023" for diverse faculty, older students, clerkships*, Feb. 6, 2023, found at https://law.hawaii.edu/richardson-among-best-law-schools-for-2023-for-diverse-faculty-older-students-clerkships/
3 Abdul-Alim, J., *Nelson Uses Critical Race to go Above and Beyond the Law*, Mar. 21, 2016, found at https://www.diverseeducation.com/demographics/women/article/15098224/nelson-uses-critical-race-to-go-above-and-beyond-the-law
4 *See e.g.* Justin Levinson's scholarly work found at https://scholarspace.manoa.hawaii.edu/collections/b9675e7b-a4bb-44ff-9252-719306c94a8c

34.    Given the diverse background of W.S.R.S.L.'s faculty and student body and its dedication to teaching and researching in the areas of racism and racial equity, one would expect that when *some* of W.S.R.S.L.'s progressive faculty members were called out for engaging in unconscious anti-Black racism they would display humility and admit when a mistake was made. Instead of practicing what they preach (or teach or research) when Professor Lawson pointed out an act of racial discrimination made by W.S.R.S.L. faculty, these faculty who were the perpetrators of the racist act of discrimination, made themselves the victims and retaliated against Professor Lawson claiming that he had created a hostile work environment.

35.    Professor Lawson is presently the only Black American-born employee in the entire W.S.R.S.L. faculty. He is also the only Black man employed at W.S.R.S.L. in any capacity. He is also the Faculty Advisor to the Black Law Students Association.

36.    Professor Lawson has been active in the civil rights movement almost his entire life, from his youth until now. Throughout his life, Professor Lawson has engaged in peaceful, non-violent protest. As a civil rights activist, Professor Lawson has participated in and led protests, marches, boycotts, and sit-ins. Professor Lawson also practiced civil rights law and has filed numerous civil rights lawsuits for black and white women, men, and children who were

31

discriminated against because of their race.

37.     Professor Lawson's speech to his faculty colleagues at the February 17, 2023, faculty meeting focused on matters about which he has written and taught extensively as a law professor.  For example, while at the Law School, Professor Lawson founded the Hawai'i Civil Rights Project legal clinic; taught a variety of substantive courses that include civil rights law, explicit and implicit racial bias law, and civil rights activism; authored a University of Hawaii Law Review article on implicit/unconscious racial bias towards Blacks; been interviewed by local and mainland media on matters relating to the above-mentioned subjects, particularly the U.S. Black Civil Right movement; and served as faculty adviser for the Law School's chapter of the National Black Law Students Association, a nationwide organization founded during the U.S. Civil Rights movement to articulate and promote the needs and goals of Black Law Students.

### UH Law School DEI Committee and Unconscious Racial Bias and How We Got Here.

38.     Black History Month is celebrated nationally in February each year. This year (2023), the W.S.R.S.L.'s D.E.I. committee circulated a flyer entitled "Reflections on The Letter from the Birmingham Jail" for Black History Month. The Committee used the W.S.R.S.L.'s announcement listserv to make their announcement. They also attached a PDF copy of Dr. Martin Luther King's "Letter

from the Birmingham Jail" to the email announcing the event.

39.    Upon receiving the announcement for this Black History Month event, Professor Lawson noticed that none of the facilitators for the Black History event were Black or ever claimed to be Black or of African-American Ancestry.[5] The facilitators of the event, who are also part of the D.E.I. committee, also did not reach out to any of the Black Law Students to participate in the Black History Month event. The facilitators did not reach out to any Black Civil Rights attorneys that practice in Hawai'i and they also did not reach out to any Black Activists to participate in the event.

40.    At a faculty meeting on February 17, 2023, before the planned Black History Month event, during the announcement portions of the meeting, Professor Lawson was given the floor to speak by Defendant Nelson. Professor Lawson then told the D.E.I. committee that excluding Blacks from the Black History Month event on Dr. King's letter about the Civil Rights Movement was implicit (or

---

5 In her book "Nice Racism" Robin DiAngelo discusses the use of "gaslighting" as a tactic by liberals as a way to deflect when confronted with their own racism. One of the facilitators, in an effort to gaslight Professor Lawson, claimed to be Black *after* Professor Lawson called for the Boycott. It should be noted that when asked by Professor Lawson and another colleague years ago about her race and ancestry, she claimed Japanese and Puerto Rican ancestry. She also DOES not claim Black or African-Ancestry in her scholarship. For example, she co-authored a piece entitled *Dismantling Civil Rights: Multiracial Resistance and Reconstruction,* where the co-author's jointly state in a footnote that: **[t]o make this more concrete, racially, we co-authors are Americans of Japanese, Filipino, Asian Indian, Korean, Puerto Rican, Caucasian, Hawaiian and Chinese ancestry."** There is no mention of any of the authors, including this Professor, claiming to be Black or of African ancestry.

unconscious) racism. Professor Lawson told the faculty that excluding Blacks from organizing or participating in the Black History Month event equates to what academic scholar and author Robin DiAngelo speaks about this in her book entitled "Nice Racism."

41.     Defendant Nelson, acknowledged that she was familiar with DiAngelo's scholarship, and Professor Lawson then further explained that *"Nice Racism"* means that some whites and non-Black liberals have internalized small, unconsciously racist acts that have been labeled "microaggressions" and are quite real. He tried to explain that DiAngelo finds that many white and [non-Black] progressives who consider themselves good and decent and non-racist can, in fact, still be racist.

42.     Ironically, the point Professor Lawson was trying to raise with W.S.R.S.L.'s faculty is also Dr. King's point in his "Letter from the Birmingham Jail." In his letter, Dr. King expresses his exasperation with those who claim to be sympathetic to his cause but do not take the time to understand what he is saying, and he concludes that "shallow understanding from people of goodwill is more frustrating than absolute misunderstanding from people of ill will."

43.     There has never been a W.S.R.S.L. a program on Native Hawaiian activism without including a Native Hawaiian on the panel or an event surrounding

WWII Japanese Internment camps where an American of Japanese Ancestry (AJA) Professor or AJA civil rights activist did not facilitate or was part of the panel. There has never been a W.S.R.S.L. sponsored event on LGBQT+ issues without having someone from that community as a facilitator or panel member. There has never been a W.S.R.S.L. panel discussion on religious and ethnic hate crimes against the Jewish community without having a Jewish person as a facilitator or panel member.

44.     Rather than admit that the exclusion of Black Law students, Black Civil Rights attorneys, and Black folks from their Black History Month event as facilitators about the Black Civil Rights Movement was discriminatory and racist, a white faculty member, looked at the event Flyer and said, "I don't see anything racist about the flyer." Professor Lawson told his colleague that her statement exemplifies DiAngelo's "Nice Racism."

45.     Although Defendant Nelson had given Professor Lawson the "floor" to speak during the "announcement" portion of the meeting, she repeatedly interrupted. Professor Lawson had to repeatedly say "Let me finish". At some point, Defendant Nelson said, "Ken, as a Black woman, I too have been subjected to discrimination; everyone has had some form of discrimination." In response to her comment, Professor Lawson told her that she was not born here and not raised in the US during that time and has no idea what Dr. King and millions of other Blacks in

the U.S. went through during the height of the U.S. Black Civil Rights movement. This was not to say Defendant Nelson has not experienced discrimination. Yet, she did not experience Jim Crow segregation, including going to inferior schools, forced bussing, beatings, lynchings, arrests, jail, and many other forms of discrimination that were unique to the U.S. Black Civil Rights Movement.

46.   Defendant Nelson eventually stopped interrupting Professor Lawson, and he finished his speech about unconscious racial bias, "Nice Racism". Professor Lawson's speech to his faculty colleagues focused on matters about which he has written and taught extensively as a law professor.  For example, while at the Law School, Professor Lawson founded the Hawai'i Civil Rights Project legal clinic; taught a variety of substantive courses that include civil rights law, explicit and implicit racial bias law, and civil rights activism; authored a University of Hawaii Law Review article on implicit/unconscious racial bias towards Blacks; been interviewed by local and mainland media on matters relating to the above-mentioned subjects, particularly the U.S. Black Civil Right movement; and served as faculty adviser for the Law School's chapter of the National Black Law Students Association, a nationwide organization founded during the U.S. Civil Rights movement to articulate and promote the needs and goals of Black Law Students.

47.   Defendant Nelson asked if everyone was ready to discuss the faculty

36

hiring portion of the meeting. All faculty members agreed to move on. The meeting continued for an additional 4 to 5 hours.

48.     No one during the meeting or after the meeting told Professor Lawson that he was hostile, threatening, name-calling, or violent in his speech or actions when he spoke about the Black History Event. No one called for security. No one asked Professor Lawson to leave the meeting. Not one faculty member left the meeting. The meeting went on for 4-5 more hours, uninterrupted. Every faculty person was called on and asked to speak on the candidates for hire. Every faculty member was able to participate in the faculty hiring portion of the meeting, including voting several times for candidates. It was not until days later AFTER Professor Lawson used the Listserv and made the public aware of the DEI committee's racism by calling for a Boycott that the issue of him creating a "hostile work environment" was first raised.

49.     One factor on whether an employee has created a hostile work environment based on speech is whether the speech disrupted the workplace is fact-specific and depends on "'the manner, time, and place in which' the employee's speech took place." *Clairmont v. Sound Mental Health,* 632 F.d 1091, 1107 (9th Cir. 2010) (citation omitted). Speech is disruptive only when there is an "'actual, material and substantial disruption,' or [there are] 'reasonable predictions of disruption' in the

workplace." Robinson v. York 566 F.3d 817, 824 (9th Cir. 2009) (citations omitted); *see also Keyser v. Sacramento City Unified Sch. Dist., 265 F.3d 741, 749 n.2 (9th Cir. 2001).* Disruption "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Nunez v. Davis*, 169 F.3d 1222, 1228 (9th Cir. 1999) (quoting *Rankin*, 438 U.S. at 388). speech that outrages or upsets co-workers without evidence of "any actual injury" to school operations does not constitute a disruption. *Settlegoode v. Portland Pub. Schs., 371 F.3d 503, 514 (9th Cir. 2004).*

50.     At the faculty meeting, one person from the D.E.I. committee apologized to Professor Lawson. A student attending the faculty meeting was in tears about the hurt and pain the racism caused Professor Lawson and her Black fellow students. Another faculty member texted Professor Lawson, saying, "I'm sorry our school has hurt you again." After the meeting, several other faculty members emailed Professor Lawson expressing support and statements of understanding of his hurt and frustration.

51.     Rather than address Professor Lawson's public concerns of anti-Black racism by trying to fix the unconscious racist act, the D.E.I. committee made

no changes to their scheduled Black History Month event. The next day following the faculty meeting, on Saturday, February 18, 2023, Professor Lawson emailed Defendant Nelson and the members of the D.E.I. committee, memorializing the faculty meeting and further explaining why excluding Blacks from the Black History Month event was racist and outlining what happened at the faculty meeting.

52.     Neither Dean Nelson nor any member of the D.E.I. committee responded to Professor Lawson's February 18, 2023 email.

53.     Hours after the email was sent, Professor Lawson attended a community event where Defendant Nelson was present that Saturday evening. Defendant Nelson asked Professor Lawson, who was seated next to his wife; she bent down, touched his shoulder, and asked him how he was doing. Defendant Nelson then introduced herself to Professor Lawson's wife. At the time, Professor Lawson believed that this act reflected positively on Defendant Nelson as a colleague. This is why he was shocked upon receiving the Notice of Investigation, alleging that she and others feared him because he created a hostile work environment.

54.     Following the faculty meeting and the follow-up email Professor Lawson sent the day after, days passed with no changes being made by the Committee for the event which was scheduled for Thursday, February 23, 2023.

Because this form of anti-Black racism is a matter of public concern, and because the D.E.I. committee was intent on going forward with the event, on Tuesday, February 21, 2023, Professor Lawson and Black Law Student Association students called for a boycott of their event by using the W.S.R.S.L.'s announcement listserv. The email requesting a boycott of the event went to W.S.R.S.L. faculty, staff, students, and alumni. To give background to the reason that we were calling for a boycott and because it was a matter of public concern, Professor Lawson's February 18, 2023 email to Defendant Nelson and the D.E.I. committee was attached to the message on the W.S.R.S.L. listserv that called for a boycott of the event.

55.     After Professor Lawson and the Black Law Student Association members called for a boycott of the event, many law students and others responded to the listserv supporting the boycott.

56.     On information and belief, seeing so much support for Professor Lawson and the Black Law Student Association members really angered the D.E.I. committee and Dean Nelson, and as DiAngelo stated in her book, the Defendants weaponized their emotions and feelings of racial discomfort and embarrassment by gaslighting those that spoke out and further retaliating by making it into a Human Resources issue against Professor Lawson.

57.     Several hours after sending out the boycott email on the

listserv, three Faculty members sent an email asking for new rules for faculty meetings be put in place, claiming that Professor Lawson's behavior *could* create a hostile work environment. Moreover, the email falsely claimed that Professor Lawson had called people names in the meeting.

58.     In response to Professor Lawson and BLSA's requests for a boycott, the D.E.I. committee sent a "Gaslighting" email the following day claiming that the Black History Event was meant to be a "book club event" and that they had planned it that way, inferring they were not being racist because they had planned it as a book club event all along. Despite Defendant Nelson and one D.E.I. committee member acknowledging and apologizing during the faculty meeting that was a mistake not to include Black students, Black Civil Rights lawyers, and activists in the Black History Month event, they were now retracting their position and no longer acknowledging that it was a mistake.

59.     In their responsive email regarding the boycott, one of the event facilitators further gaslighted Professor Lawson and the Black Law Student Association members by now claiming to be Black or a descendant of African-Ancestry, even though this facilitator had never made such a claim before. *See supra.* In their responsive email regarding the boycott, the D.E.I. committee canceled their Black History Month event.

41

60.     The Gaslighting email is what the two DEI committee members wanted the public to believe --the Black History event was intentionally planned as a book club event, so it wasn't unconscious racism. Yet, these same two committee members privately met with Black Law students and apologized for not including them or other Blacks as facilitators. They admitted to the Law Students that what they did was wrong.

61.     On Thursday, February 23, 2023, a Faculty member followed up with another email calling for new faculty rules in meetings and new rules on using the W.S.R.S.L's listservs.

62.     On February 27, 2023, Bruno emailed Professor Lawson a Notice of Investigation letter alleging that Professor Lawson engaged in workplace violence at the faculty meeting and in his email calling for a Boycott. Defendant Bruno banned Professor Lawson from the Law School campus for a month and ordered him to work from home. In that same letter Defendant Bruno banned Professor Lawson from using W.S.R.S.L's Listserv to make any announcements or to transmit news to faculty and students.[6]

63.     Bruno explained to Professor Lawson that U.H. is investigating

---

[6] Since 2020, Professor Lawson has been challenging W.S.R.S.L.'s illegal classification and racially discriminatory salary structure. Professor Lawson's grievances and civil rights complaints against W.S.R.S.L.were pending at the time the Defendants retaliated against Professor Lawson for exercising his right to free speech.

the allegations of workplace violence and that Professor Lawson should cooperate with the investigation.

64.      At no time did Professor Lawson make a threat to any person, and even if the allegations contained in Provost Bruno's letter and Notice of Investigation were true, Professor Lawson's Speech and actions do not meet the definition of workplace violence or hostile work environment. All of the Defendants knew that when they made these false allegations.   The Ninth Circuit looks to "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Johnson v. Riverside Healthcare Sys.* 534 F.3d 1116, 1122, (9th Cir. 2008) (quoting *Kortan v. Cal. Youth Auth.*, 217 F. 3d 1104, 1110 (9th Cir. 2000) (internal quotation marks and citations omitted). Although "mere utterance of an ... epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII," *Harris v. Forklift Sys.,* 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (internal quotations marks and citations omitted).

65.      No one from U.H. contacted Professor Lawson about the "investigation' from February 27, 2023, through March 28, 2023.

43

66.     On March 28, 2023, Bruno emailed Professor Lawson another letter extending the penalties and the ban from campus for another month until April 30, 2023, and also informed Professor Lawson that new allegations were being made against him. Now he was being investigated for misogyny because he only directed his comments to women, not men. The claim of misogyny is another attempt to make the Defendants the victims and Professor Lawson the villain.

67.     These facts are beyond dispute:

A.     The members of the DEI committee that were named on the Flyer at the faculty meeting were all female.

B.     Professor Lawson was given the floor and permission to make his announcement. Professor Lawson's speech began by addressing the DEI committee. Professor Lawson was not speaking to the Dean.

C.     The male member named on the Flyer was not present at the faculty meeting.

D.     The only people at the faculty meeting who engaged or said anything to Professor Lawson were female. Not one man said one word to Professor Lawson during the meeting.

E.     Whatever Professor Lawson said to Defendant Nelson, it was in response to Nelson's insensitive comments to him about the Black Civil

Rights movement.

F.      What Professor Lawson said to his white female colleague who told him that she's looked at the Flyer and did not find it racist, was in response to her racially insensitive statement.

G.      On Professor Lawson's Saturday, February 18, email to the DEI committee Professor Lawson requested that the Committee forward the email to the only male member because Professor Lawson did not have his email address.

H.      The notice also claims that it was misogyny when Professor Lawson did not respond to the emails seeking new faulty rules, but he responded to the email the women sent. Again, he completely ignores the fact that his response to the email sent by the three female faculty members was not because they were female but because they lied on him. A plain reading of the email chain demonstrates it's the lie that generated Professor Lawson's response.

68.     The First Amendment protects the white faculty member's speech when she said she did not find the Flyer racist because it allowed Blacks to come to the event and participate in the audience. Plaintiff responded to these racially insensitive statements by telling her that her statement was an example of

"Nice Racism."

69.     Defendant Nelson has a First Amendment right to say what she said to Professor Lawson, and Professor Lawson had a First Amendment Right to respond to Defendant Nelson's racially insensitive comment about the U.S. Black Civil Rights Movement.

70.     Because they did not like Professor Lawson calling for a Boycott and bringing to light what they wanted to remain in the dark, Defendants weaponized the workplace violence policy as a pretextual sword to silence Plaintiff after exercising their free speech rights to make racially insensitive statements. Moreover, they did not seek to weaponize the workplace violence policy until Plaintiff used the listserv to call for a Boycott days after the meeting.

71.     In his March 28, 2023 letter to Professor Lawson, Bruno claimed that U.H. was "is exploring processes, tools, and mechanisms to allow you to return to the Law School Campus."

72.     During the month of April, no investigator contacted Professor Lawson regarding the investigation of the case.

73.     On April 28, 2023, Bruno emailed Professor Lawson another letter extending the penalties and the ban from the Law School campus for another month until May 31, 2023.

74.     During the month of May, no investigator contacted Professor Lawson regarding the alleged "investigation."

75.     On May 30, 2023, Bruno emailed Professor Lawson yet another letter extending the penalties and the ban from the Law School campus for another month until June 28, 2023.

76.     During the month of June, no investigator contacted Professor Lawson regarding the alleged "investigation."

77.     On June 30, 2023, Bruno emailed Professor Lawson for the fifth time and attached a letter extending the penalties and the ban from the Law School campus for another day until July 31, 2023. In this letter, Bruno told Professor Lawson that a new co-investigator had been appointed because the other one had "time constraints."

78.     On July 28, 2023, Bruno emailed Professor Lawson for the Sixth time and attached a letter extending the penalties and the ban from the Law School campus for another day until August 30, 2023.

79.     In August of, 2023, Professor Lawson discovered the serious conflict of interest and relationship that existed between Defendants Bruno, Nelson, and Dean Osorio.

80.     Professor Lawson requested that UH appoint a neutral Decision

Maker. UH still has not responded, so Professor Lawson is forced to file this Complaint now.

81.      Professor Lawson is the Co-Director of the Hawai'i Innocence Project legal clinic at W.S.R.S.L. Professor Lawson is also the Director of the Beyond Guilt Hawai'i legal clinic at W.S.R.S.L. Professor Lawson also teaches W.S.R.S.L law courses year round, including every summer.

82.      Bruno's decision to ban Professor Lawson from the U.H. and W.S.R.S.L. campus forces Professor to have to teach his law courses online. This has had a negative effect on his law students, who had to, without warning, convert to an online class format and who had no ability to choose whether they wanted to take his courses online.

83.      The desire to maintain a sedate academic environment does not justify limitations on a teacher's freedom to express himself on political issues in **a vigorous, argumentative, unmeasured, and even distinctly unpleasant terms—** *Rodriguez* at 708. (Emphasis added).

84.      Plaintiff's protected speech motivated the Defendants to retaliate against him and take adverse employment actions that are ongoing and punitive. The banishment from the Law School campus, the threat of discipline through a 6-month long and still ongoing, the restraint and chilling effect on Professor

Lawson's First Amendment right to speak and to use the listserv to make announcements are being done in retaliation for Professor Lawson alleging racial discrimination at the Black History Month event and calling for a boycott of the event. According to the Ninth Circuit Court of Appeals, the key question is whether the retaliatory activity "would 'chill or silence a person of ordinary firmness' from continuing to speak out." *Blair v. Bethel Sch. Dist., 608 F.3d. 540, 543 n.1 (9th Cir. 2010) (quoting Mendocino Env't Ctr. V Mendocino County, 192 F. 3d 1283, 1300 (9th Cir. 1999).* The "precise nature of the retaliation is not critical to the inquiry." *Coszalter v. City of Salem, 320 F.3d at 968, 974.* Under this test the Ninth Circuit Court of Appeals has recognized that "[v]arious kinds of employment actions may have an impermissible chilling effect," including "minor acts of retaliation," *Dahlia v. Rodgriguez, 735 F. 3d 1060, 1079, (9th Cir. 2013 (en banc)* and "[i]nformal measures, such as 'the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation.'" *Mulligan v. Nichols, 835 F.3d 983, 989 n.5 (9th Cir. 2016) (citation omitted).* The Ninth Circuit Court of Appeals has also recognized that the insinuation or threat that "some form of punishment or adverse regulatory action" may follow can also chill a person from speaking and violate the First Amendment. *Greisen v. Hanken, 925 F. 3d 1097, 1113 (9th Cir. 2019) Greisen, 925 F. 3d at 1114 (quoting Brodheim v. Cry, 584 F.*

*3d. 1262, 1269-70 (9th Cir. 2009). Coszalter at 976-77,* (even a "threat of

disciplinary action" may constitute adverse employment action for purposes of

First Amendment retaliation).

85.      In April 2023, the Foundation for Individual Rights and

Expression ("F.I.R.E.")[7] , on Professor Lawson's behalf, sent a letter to U.H.

explaining why the alleged "investigation" and banishment from campus violated

the First Amendment and why Professor Lawson's Speech at the faculty meeting

and in the email asking for a boycott did not constitute true threats and were not

considered workplace violence. Exhibit K.

86.      Professor  Lawson  reluctantly  files  this  suit  against  the

Defendants for retaliating against Professor Lawson for speaking and boycotting on

a matter of public concern, and both forms of speech are protected by the 1st and

14th Amendments of the U.S. Constitution.

## COUNT I

### First Amendment Retaliation under 42 U.S.C. § 1983
### (Against All Defendants)

87.      Professor Lawson re-alleges and incorporates each allegation set

---

7 F.I.R.E.'s "mission is to defend and sustain the individual rights of all Americans to free
speech and free thought — the most essential qualities of liberty." found at
https://www.thefire.org

forth in the preceding paragraphs of this Complaint by reference.

88. As described above, Defendant Bruno, Defendant Nelson, and Defendants Does 1-8 made the decision to make false allegations of workplace violence with the intent to chill Professor Lawson's amendment rights to speak on matters of public concern and to retaliate against Professor Lawson for speaking on a matter of public concern.

89. Professor Lawson's Speech at the faculty meeting, on the Listserv and in emails to colleagues are protected speech as racism and anti-Black racism is political speech and a matter of public concern. *Demers v. Austin, (9th Cir.) 746 F.3d 402, 2014,*

90. As described above, Nelson and Doe faculty members, current and former, who were embarrassed by Professor Lawson exposing their implicit anti-Black racism, used the investigation for workplace violence and hostile workplace as a pretext to punish and ban Professor Lawson in retaliation for his exercising his right to free speech on a matter of public concern.

91. As a direct and proximate result of Defendants' adverse employment actions chilling his speech and precluding his right to make announcements via W.S.R.S.L.'s faculty listserv, Professor Lawson has suffered irreparable injury, including being deprived of his constitutional right to free

expression.

## COUNT II

### Declaratory Relief Under 28 U.S.C. § § 2201, et seq.
### (Against All Defendants)

92.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

93.    An actual controversy has arisen and now exists between Professor Lawson and Defendants concerning whether Defendants' banning Professor Lawson from campus and retaliating against him for speaking out against matters of public concern violates the Constitution.

94.    Declaratory relief is appropriate where "the judgment will serve a useful purpose in clarifying and settling the legal relations issue" and "will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Environment Tex. Citizen Lobby, Inc. v. Exxon Mobile Corp.* 824 F.3d 507, 523 (5th Cir. 2016).

95.    The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976).*

96.    "[C]onstitutional violations cannot be adequately remedied

through damages…" *Am. Trucking Ass'ns, Inc. v. City of Los Angeles,* 559 F.3d 1046, 1059, (9th Cir. 2009) (internal quotations marks omitted).

97.    Plaintiff demands declaratory judgment that Defendants' banning of Professor Lawson from the Law School campus and restricting and chilling his right to free speech for speaking on a matter of public concern are unconstitutional abridgments of the freedom of speech. Such declaratory judgement will clarify and settle the legal relations issue and will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to this proceeding.

<u>**COUNT III**</u>

**(Conspiracy To Violate Civil Rights: 42 U.S. C. §1985)**

**(Against All Individual Defendants)**

98.    Plaintiff hereby incorporates the allegations contained in Paragraphs 1 through 97 as if fully set forth here.

99.    Defendants Nelson, Bruno, and Individual Defendants John and Jane Does, concertedly deprived Plaintiff of his constitutional rights to freedom of speech and due process, and those concocted acts evidence a conspiracy to deprive Plaintiff of equal privileges and immunities under laws on violation of 42 U.S.C. § 1985 (3).

100.    Plaintiff has consequently suffered damages, as set forth above.

## Count IV

### (Neglect to Prevent Violation of Civil Rights: 42 U.S.C. §1986)

### (Against All Defendants)

101.     Plaintiff incorporates the allegations in Paragraphs 1 through 100 as if fully set forth here.

102.     Under 42 U.S.C. §1986 a person who has actual or constructive Knowledge of but neglects to prevent acts prohibited by 42 U.S.C. §1985 is liable for damages resulting from the acts.

103.     Each Defendant was aware, actually or constructively, of the discriminatory and retaliatory actions of the other Defendants or their employees had the ability to prevent the actions and failed to prevent the actions, in violation of 42 U.S.C. §1986.

104.     Plaintiff has consequently suffered injury and damages, as set forth above.

WHEREFORE, Plaintiff prays for Judgment in his favor and against Defendants, jointly and severally, as follows:

A.     An immediate emergency order, temporary restraining order, and further injunctive relief as outlined above;

B.     Special damages in an amount to be determined at a trial or

54

hearing hereof;

      C.    General damages in an amount to be determined at a trial or hearing hereof;

      D.    Compensatory damages in an amount to be determined at a trial or hearing hereof;

      E.    Punitive damages against all defendants except the State in an amount to be determined at a trial or hearing hereof;

      F.    Reasonable attorneys' fees and costs;

      G.    Pre-judgment interest and post-judgment interest; and

      H.    Any and all other relief as may be deemed just and equitable by the Court.

DATED: Honolulu, Hawaii, _8/21/23_.

KENNETH L. LAWSON, PRO-SE