IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAI'I

| | |
|---|---|
| KENNETH L. LAWSON, | CIV. NO. 23-00348-LEK-RT |
| Plaintiffs, | |
| v. | MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, FOR PRELIMINARY INJUNCTION |
| UNIVERSITY OF HAWAI'I, MĀNOA; PROVOST MICHAEL BRUNO; DEAN CAMILLE NELSON; JOHN AND JANE DOES 1-7 WILLIAM S. RICHARDSON SCHOOL OF LAW FACULTY MEMBERS, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER OR, IN THE ALTERNATIVE, FOR
PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

I.    INTRODUCTION............................................................1

      Attempts to Resolve this Issue Without Litigation..................1


II.    STATEMENT OF FACTS.............................................3

      A. Retaliation and Interference with Plaintiff's First and
          Fourteenth Amendment Rights......................................3

      B. Ongoing, Irreparable Harm to Plaintiff: Defendants'
          Continued Implementation of its Policies Violates
          Plaintiff's First Amendment Rights...............................10


III.    STANDARD OF REVIEW.........................................13

IV.    ARGUMENT............................................................15

      A. Plaintiff is Likely to Succeed On the Merits.....................15

      B. Academic Freedom Protects Professor Lawson's
          Speech at the Faculty Meeting and His Use of
          the Listserve to Call for a Boycott...............................17

      C. Plaintiff Suffered an Adverse Employment Action..............21

      D. Plaintiff Is Suffering Irreparable Harm..........................24

      E. The Balance of Equities Tips Sharpley in
          Plaintiff's Favor....................................................24

      F. A Preliminary Injunction and Temporary Restraining
          Order Is in the Public Interest......................................25

G. CONCLUSION.................................................25

## **TABLE OF AUTHORITIES**

**Constitutional Provisions**

U.S. Const., amend. I ..1,10, 12, 14, 15, 16, 17, 19, 20, 22, 24, 25

**Policies**

U.H. Administrative Procedure AP 1.202.........................................1

U.H. Executive Policy EP 9.210.......................................................1

U.H. Executive Policy EP 1.202.......................................................1

U.H. Executive Policy EP 1.204.......................................................1

U.H.P.A. 2012-2025 Collective Bargaining Agreement.........................1

Cases

*Adamian v. Jacobsen*, 523 F. 2d 929 (9th Cir. 1975).

*Allen v. Scribner*,812 F. 2d 426 (9th Cir. 1987)..........................21,22, 23

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011).....13

*Alpha Energy Savers, Inc. v. Hansen*, 381 F. 3d 917 (9th Cir. 2004)..........16

*Anderson v. Central Point School District*, 746 F. 2d 505 (9th Cir. 1984)...22

*Candelaria v. City Tolleson* 721 Fed. Appx. 588 (9th Cir. 2017)..............18

*Connick v. Myers,* 461 U.S. 138, 148 n.8, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983).................................................................16

*Coszalter v. City of Salem*, 320 F. 3d 698, 973 (9th Cir. 2003)...............15

*Daniels v. Wayans*, 8 Cal. App. 5th 367, 397,

213 Cal. Rptr. 3d 865 (2017)...............................................16

*Demers v Austin*, 746 F.3d 402 (9th Cir. 2014)...........................17,18

*Dodge v. Evergreen School Dist. #114*,
56 F. 4th 767 (9th Cir. 2022)...............................16,17,20,21


*Desrochers v. City of San Bernardino, 572 F.3d 703, 712 (9th Cir. 2009)*..18

*Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673,
49 L.Ed 2d 547 (1976)..................................... 17, 24

*Faragher v. City of Boca Raton*, 524 U.S. 775, (1998).......................23

*Freedman v. State of Maryland*, 380 U.S. 51 (1956).........................12

*Gibson v. United States* 781 F. 2d 1334  (9th Cir. 1986)......................22

*Goldie's Bookstore, Inc. v. Super. Ct. of California*, 739 F.2d 466
(9th Cir. 1984)..........................................24

*Healy v. James*, 408 U.S. 169 (1972)......................................15

*Human Life of Washington v. Brumsickle*, 624 F.3d. 990 (9th Cir. 2010)....13

*Int'l Soc'y for Krishna Consciousness v. Kearnes*, 454 F. Supp.
116 (E.D. Cal. 1978)......................................25

*Jordahl v. Brnovich*, 336 F. Supp.3d 1016 (2018)...........................13

*Keyser v. Sacramento City Unified Sch. Dist*, 265 F.3d  741 (9th Cir. 2001).

*Klein v. City of San Clemente*, 584 F. 3d 1196  (9t Cir. 2009)............17,24

*Lopez v. Brewer*, 680 F.3d 1068 (9th Cir. 2012)..............................13

*Lopez v. Candaele*, 630 F.3d 775 (9th Cir. 2010)............................14

*Mosavi v. Mt. San Antonio Coll.*, 805 F. Apo'x 502 (9th Cir. 2020)...........23

iv

*Nunez v. City of Los Angeles*, 147 F.3d 867 (9th Cir. 1998)..................…..17

*Rodriguez v. Maricopa County Cmty. College Dist.* 605 F.3d 703
(9th Cir. 2009)……………………………………………………………...20,23

*Saxe v. State Coll. Area School Dist.*, 240 F. 3d 200 (3rd. Cir. 2001)……..23

*Sheel Offshore, Inc. v. Greenpeace, Inc.* 709 F.3d 1281 (9th Cir. 2013)…...13

*Thomas v. Carpenter,* 881 F.2d 828 (9th Cir. 1989)………………….....22

*Turner v. City & Cnty. Of S.F.*, 788 F. 3d 1206 (9th Cir. 2015)………....…15

*Twitter v. Sessions,* 263 F. Supp. 3d 803 (N.D. Cal. 2017)…………..……...12

*Ulrich v. City and County of San Francisco,*
308 F. 3d 968 (9th Cir. 2002)……………………………………….....22

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000)…….......15

*Winter V Natural Res. Def. Council, Inc.,* 555 U.S. 7, 129 S. Ct. 365,
172 L. Ed. 2d 249 (2008)………………………………………………..13

## MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, FOR PRELIMINARY INJUNCTION

### I.    INTRODUCTION

Plaintiff Kenneth L. Lawson ("Professor Lawson or Plaintiff") would like to speak freely about anti-Black racism and implicit bias at The William S. Richardson School of Law ("W.S.R.S.L") and report employer-sponsored racism at W.S.R.S.L or elsewhere when it occurs, without being retaliated against by Defendants who currently are using and abusing Defendants' EEO and Title IX policies to retaliate against Plaintiff for exercising his Frist Amendment rights to expose racism and employment violations of Defendants. Plaintiff would like to continue to exercise his First Amendment right to speak on issues of public interest, specifically race discrimination and employment violations of law, such as Defendants' abuse of the faculty classification system at W.S.R.S.L. to violate equal pay for equal work laws and otherwise discriminate against Plaintiff.

Plaintiff has been attempting to resolve this issue informally with Defendants and Defendants' counsel since being banished from the W.S.R.S.L. campus more than six months ago to no avail. Declaration of Kenneth L. Lawson ("Lawson Decl."), ¶¶ 54-66.

Plaintiff thus moves this Court for a temporary restraining order and

1

preliminary injunction. Specifically, Plaintiff asks this Court to order

Defendants to:

1. Rescind the Notices of Investigation orders banishing Plaintiff from in person classroom teaching, his office, and the clinics he directs, the Hawaiʻi Innocence Project and Beyond Guilt Hawaiʻi at W.S.R.S.L.;

2. Terminate any investigation related to the Notices of Investigations issued to Plaintiff based on Plaintiff's engagement in protected speech;

3. Cease enforcing Defendant U.H.'s workplace-related policies [**Exhibits 1-4**] based on allegations of speech and conduct that do not rise to the level of harassment as defined in Policies 9.210, 1.202 and 1.204;

4. Cease using Article XVIII, B.6. of the Unit 7 collective bargaining agreement [**Exhibit 5**] to weaponize Administrative Procedure AP 1.202, to ban and restrict Professor Lawson from associating with his students, the legal clinics he directs, as well as the W.S.R.S.L. chapter of the National Black Law Students Association ("N.B.L.S.A." or "B.L.S.A.")[1] on the W.S.R.S.L. campus.

---

1 The National Black Law Students Association (NBLSA), founded in 1968, is a nationwide organization formed to articulate and promote the needs and goals of black law students and effectuates change in the legal community.

## II.   STATEMENT OF FACTS

### A. Retaliation and Interference with Plaintiff's First and Fourteenth Amendment Rights

Professor Lawson is the only Black man employed at W.S.R.S.L., in any capacity, and the only Black faculty member who was born and raised in the U.S. *Id* ¶ 15. On February 10 and 11, 2023, Plaintiff filed a grievance and a complaint with the Hawaiʻi Civil Rights Commission of discrimination based on race, criminal record, disability, and breach of settlement agreement against Defendants Bruno and Nelson. *Id.* ¶ 12.

Professor Lawson has been active in the civil rights movement his entire life. Among other specific activities, Plaintiff pursued dozens of civil rights lawsuits on behalf of clients who had been discriminated against, taught law school courses in which civil rights are key components of the curriculum, created a law school Civil Rights clinic, served as Faculty Adviser to the W.S.R.S.L. chapter of the Black Law Students Association ("B.L.S.A."), and authored a University of Hawaiʻi Law Review article on implicit bias generally and particularly implicit bias against Black men based on an irrational, subconscious fear of physical violence by Black men. *Id.* ¶ 15.

Black History Month is celebrated nationally every February. For Black

History Month in 2023, and within days of the filing his grievance against Defendants Bruno and Nelson, W.S.R.S.L.'s Diversity, Equity, and Inclusion ("D.E.I.") committee used the W.S.R.S.L. listserv to circulate a flyer with the picture of a raised black fist that was entitled "Reflections on a Letter from Birmingham Jail." *Id.* ¶ 16 and **Exhibit 6**. Attached to the flyer was a PDF copy of Dr. Martin Luther King's "Letter from the Birmingham Jail." *Id.* **Exhibit 7.** Plaintiff noticed that none of the facilitators for this Black History Month event were Black or of African American ancestry.[2] Plaintiff concluded that the committee had evidently not asked any of Hawaii's prominent Black Civil Rights activists and attorneys to participate in the event. *Id.* ¶ 17. At a faculty meeting on February 17, 2023, Plaintiff raised his hand during the announcement phase of the meeting and spoke only after being invited to do so by Defendant Nelson. *Id.* ¶ 18. Plaintiff asked the D.E.I.

---

2 One of the facilitators, Professor Susan Serrano, claimed to identify as Black *after* Professor Lawson called for the Boycott. It should be noted that when asked by Professor Lawson and another colleague years ago about her race and ancestry, Professor Serrano claimed Japanese and Puerto Rican ancestry only. She also has not claimed Black or African ancestry in her scholarship. For example, in a footnote to an article Professor Serrano co-authored, entitled *Dismantling Civil Rights: Multiracial Resistance and Reconstruction,* the authors jointly state: "**[t]o make this more concrete, racially, we co-authors are Americans of Japanese, Filipino, Asian Indian, Korean, Puerto Rican, Caucasian, Hawaiian and Chinese ancestry."** There is no mention of any of the authors, including Professor Serrano, ever identifying or claiming to be Black or have African ancestry.

committee members at the meeting why they had not included any Black individuals as facilitators or panelists in the upcoming Black History Month event. *Id.* ¶ 19.  Plaintiff explained that excluding Blacks from an event like this appeared to reflect implicit (or unconscious) racial bias. *Id.* ¶ 21. Plaintiff further explained it was an example of what academic scholar and author Robin DiAngelo addresses at length in her book "Nice Racism." *Id.* ¶ 22. Defendant Nelson acknowledged that she was familiar with DiAngelo's scholarship, and Plaintiff continued explaining Nice Racism. *Id.* At some point while Plaintiff was speaking, a white faculty member, Carole Peterson, drew attention to the event flyer and said, "I don't see anything racist about the flyer. It allows Black people to come and share [from the audience]." *Id* ¶ 23. Plaintiff responded by telling her that her statement was another example of DiAngelo's Nice Racism. *Id.* Defendant Nelson, in an apparent attempt to shield that faculty member and the D.E.I. committee members in attendance from having to further address the allegation of their having engaged in Nice Racism, repeatedly interrupted Plaintiff, repeatedly saying "okay we made a mistake," as though Plaintiff should stop talking about Nice Racism at W.S.R.S.L. *Id.* Plaintiff believed that simply calling the exclusion of Blacks as facilitators or panelists "a mistake," without trying to determine how it happened or even noting that it had been hurtful to Black members of the

W.S.R.S.L. community, would only make the situation worse. Plaintiff explained the importance of talking about how and why the mistake had happened. *Id.* ¶ 25. To help make his point, Plaintiff shared some of his personal experiences with the U.S. Black Civil Rights Movement. *Id.* Plaintiff described how his parents, aunts, and uncles had all been directly involved in the U.S. Black Civil Rights movement. *Id.* Plaintiff described how he and his family members had been peacefully protesting in Cincinnati in 1968 following Dr. King's assassination, when Plaintiff watched his mother being beaten with a nightstick and arrested while protesting peacefully. *Id.*

Defendant Nelson interrupted Plaintiff again during these remarks and said to Plaintiff, "Well, Ken, as a Black woman, I have been discriminated against, and, Ken, everybody in here has been through some type of discrimination." *Id* ¶ 26. Responding to that statement, Plaintiff pointed out that Defendant Nelson had not been born or raised in the U.S. and so she and her family may not have experienced systematic Jim Crow discrimination or forced bussing to schools where teachers turned a blind eye when children like Plaintiff were regularly called the nigger. *Id.* ¶ 27. Plaintiff shared these personal experiences to help the faculty better understand why excluding Blacks from the Black History Month event was extraordinarily hurtful and racist. Based on the facial expressions of the some of the committee members,

Carole Peterson, and Defendant Nelson, Plaintiff believes his comments did not scare them, but clearly made them very angry. *Id.* ¶ 28.

After Professor Lawson finished speaking, Defendant Nelson asked if everyone was ready to move from the announcements portion of the meeting to the faculty-hiring portion. *Id.* ¶ 29. Everyone attending the meeting either expressed agreement or remained silent as Defendant Nelson moved to the next agenda item, faculty hiring. *Id.* ¶ 30. The meeting continued for an additional four to five hours, uninterrupted, except for occasional bathroom breaks. *Id.* ¶ 36. No one during the meeting or afterward told Professor Lawson they thought he had acted in a hostile or threatening manner while speaking about the Black History Month event. *Id.* ¶ 33. At no time during the entire meeting did anyone say or suggest that Plaintiff had done anything that might be viewed as creating a hostile workplace. No one suggested Plaintiff had acted out of line or done or said anything that made them fearful. No one left the meeting room to avoid being in the same room with Plaintiff. No one asked Plaintiff to leave the meeting. And no one called for security. Instead, the meeting was completed without anything said about Plaintiff's behavior or speech, other than one member of the D.E.I. committee and a student member of the hiring committee, both of whom apologized to Professor Lawson for the pain the committee had caused. *Id.* ¶ 31. Another faculty

member texted Professor Lawson during the hiring portion of the meeting, "I'm sorry our school has hurt you again." *Id.* ¶36. After the meeting ended, several additional faculty members emailed Plaintiff, acknowledging his hurt and frustration, and expressing support. *Id* ¶ 38. Because it was a hiring meeting, every faculty member was required to participate in the discussion of each candidate and multiple rounds of voting, and every faculty member did so. *Id.* ¶ 36.

Plaintiff sent an email to Defendant Nelson and the members of the D.E.I. committee on Saturday, February 18, 2023, the day after the faculty meeting, further explaining why not including Blacks as facilitators or panelists in the Black History Month event was racist. *Id.* ¶ 40. A copy of this email is attached as **Exhibit 8.** Neither Defendant Nelson nor any member of the D.E.I. committee ever responded to Professor Lawson's February 18, 2023, email. Lawson Decl. ¶ 42. Hours after sending this email, Professor Lawson attended a community event and had already taken his seat when Defendant Nelson stopped as she walked by the seated Plaintiff, put her hand on his shoulder, asked how he was doing, and introduced herself to Plaintiff's wife. *Id.* ¶ 41. At no point during this interaction did Defendant Nelson express any fear or discomfort in approaching Professor Lawson. *Id.* As of several days later, the D.E.I. committee had still not made any changes to the

event scheduled for Thursday, February 23, 2023. On Tuesday, February 21, 2023, Professor Lawson and Black B.L.S.A. members used W.S.R.S.L.'s announcement listserv to call for a boycott of the planned Black History Month event. *Id.* ¶ 43. This email went to W.S.R.S.L. faculty, staff, students, and alumni. **Exhibit 9.**

Hours later, three female faculty members sent an email asking for new rules for faculty meetings, implying that without new rules, Plaintiff might say or do something at a future meeting that "could be considered creating a hostile work environment." Moreover, this email falsely claimed Plaintiff had called people names in the meeting. A copy of the email chain and memo that was attached is attached as **Exhibits 10 and 11.** Plaintiff immediately responded to that email, not because the three people who sent it were female, but because they had lied in claiming that he called people names at the meeting. *Id.* ¶ 46. In direct response to Plaintiff's and B.L.S.A.'s requests for a boycott, the D.E.I. committee sent an email the following day claiming that they had always intended the Black History Event to be a "book club event," implying this explained the exclusion of Blacks as panelists or facilitators, and that they had therefore not engaged in Nice Racism. **Exhibit 12.** This made no sense on its face and completely ignored that Defendant Nelson and one D.E.I. committee member had acknowledged during the faculty meeting that

9

the exclusion of Blacks as panelists or facilitators had been "a mistake." On February 27, 2023, Defendant Bruno emailed Plaintiff a Notice of Investigation, **Exhibit 13,** and then on February 28, 2023, Defendant Bruno extended Plaintiff's banishment and restricted and chilled Plaintiff's speech and added a charge of misogyny. **Exhibit 14**.

### B. Ongoing, Irreparable Harm to Plaintiff: Defendants' Continued Implementation of Policy Violating Plaintiff's First Amendment rights.

Defendants Bruno and Nelson were at the time of Plaintiff's banishment from the W.S.R.S.L. campus on February 27, 2023, and at all times since then, the subject of complaints Plaintiff filed against them prior to the Plaintiff's speech at the February 17, 2023, faculty meeting. Defendant Bruno, knowing Plaintiff had previously filed a discrimination complaint and grievance against him, chose to oversee Plaintiff's investigation rather than have EEO or Title IX serve as Coordinator. Defendant Bruno then appointed Dean Jon Osorio as Decision Maker in the investigation being overseen by Defendant Bruno. Bruno, Nelson, and Osorio had for two years been working together to create a new "Institute" at W.S.R.S.L. whose mission would overlap with the missions of the clinics run by Plaintiff and compete with Plaintiff's clinics for limited space, students, and financial resources at W.S.R.S.L. **Exhibits 15, 16 and 17**.

Defendant U.H. has denied Plaintiff's request that Osorio be replaced with a neutral Decision Maker in this matter. Despite glaring conflicts of interest, Defendants' have refused to replace Osorio as Decision Maker or to agree to mediate all issues with Plaintiff prior to the rendering of a decision by Osorio. Under U.H. Policy, investigations are supposed to last no longer than 90 days. *See* AP 1.202, 5e. **Exhibit 1**. This investigation is not just entering its seventh month; there is no end in sight. In the meantime, Plaintiff believes any attempt on his part to speak publicly on certain issues of public and personal importance, including racial discrimination at W.S.R.S.L. and U.H.'s mockery of equal pay for equal work will be met with harsh discipline, up to and including termination. Plaintiff was interviewed by investigators almost six months after his banishment. **Exhibit 18 .**

Defendants' policies grant unbridled discretion to Defendant Bruno, as they do not provide any notice of the institution of "supportive measures"[3] or a hearing to Plaintiff before issuing the no-contact, banishment from campus and prior restraint on Plaintiff's right to free speech. The policy does not provide any definition of "supportive measures"

---

[3] Defendants' Discrimination Complaint Procedure ("AP 1.202) Exhibit 1, Section III 2.

or any mechanism to appeal "supportive measures." According to AP 1.202,

Section III 2:

> **Supportive Measures are non-disciplinary, non-punitive**, individualized services offered as appropriate, as reasonably available, and without fee or charge to the Complainant or the Respondent before or after the filing of a complaint or where no complaint has been filed. Supportive Measures are designed to restore or preserve equal access to the recipient's University-sponsored program or activity without **unreasonably burdening** the other Party, including measures designed to protect the safety of all Parties or the recipient's educational environment. **Exhibit 1.** (Emphasis added)

U.H.'s Policies have allowed Defendant Bruno to issue Notices of Investigations to Plaintiff that have banished him from W.S.R.S.L. campus and restricted and chilled his speech for an unlimited duration without review.

Governments must demonstrate at least three procedural safeguards: (1) "restraints prior to judicial review may be imposed only for a specified brief period during which the status quo must be maintained"; (2) "expeditious judicial review" must be available; and (3) the government must bear "the burden of seeking judicial review and the burden of proof in court." *Twitter v. Sessions,* 263 F. Supp. 3d 803, 810 (N.D. Cal. 2017) (Citing inter alia *Freedman v. State of Maryland,* 380 U.S. 51, 58-60 (1956)). The only appeal occurs after the investigation is complete and an adverse finding has been made.

12

The kicker is that upon filing the appeal it goes to the very same

administrator that issued the order, Defendant Bruno. AP 1.202 9 (b).

*See* **Exhibit 1.** Thus, Defendants' Notices of Investigations to Plaintiff

and Policies fail both the First Amendment's substantive and

procedural requirements.

### III.   STANDARD OF REVIEW

"[I]njuctive relief is an extraordinary remedy that may only be

awarded upon a clear showing that the Plaintiff is entitled to such relief."

*Winter V Natural Res. Def. Council, Inc.,* 555 U.S. 7, 129 S. Ct. 365, 376,

172 L. Ed. 2d 249 (2008). To obtain a temporary restraining order or a

preliminary injunction, a plaintiff must demonstrate that (1) he is likely to

succeed on the merits, (2) in the absence of preliminary relief, he is likely to

suffer irreparable harm, (3) the balance of equities tips in his favor, and (4)

an injunction is in the public interest. *Winter v. Nat. Res. Def. Council,* 555

U.S. 7, 20 (2008). In this Circuit, however, "if a plaintiff can only show that

there are 'serious questions going to the merits' – a lesser showing than

likelihood of success on the merits – then a preliminary injunction may still

issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the

other two *Winter* factors are satisfied." *Sheel Offshore, Inc. v. Greenpeace,*

*Inc.* 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild*

*Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9ᵗʰ Cir. 2011)): *see also Jordahl v. Brnovich*, 336 F. Supp.3d 1016, 1038-39 (quoting *Cottrell*). Under this "serious questions" variant of the *Winter* test, "[t]he elements…must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9ᵗʰ Cir. 2012).

When a plaintiff has made a pre-enforcement constitutional challenge and has not yet been penalized for violating the challenged statute, "neither the mere existence of a proscriptive law nor a generalized threat of prosecution satisfies that 'case or controversy' requirement," but "when a challenged statute risks chilling the exercise of First Amendment rights, the Supreme Court has dispensed with rigid standing requirements and recognized 'self-censorship' as "a harm that can be realized even without an actual prosecution." *Human Life of Washington v. Brumsickle,* 624 F.3d 990, 1000 (9ᵗʰ Cir. 2010) (internal quotation and citations omitted).[4] "In an effort to avoid the chilling effect of sweeping restrictions, the Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their

---

4 While this matter involves the U.H. Notice of Investigations Professor Lawson received and not a challenged statute, the analysis is similar. Plaintiff should not have to "speak first and take [his] chances with the consequences" of Defendants enforcing an unconstitutional policy or conditions on Plaintiff as stated in the Notice of Investigations.

chances with the consequences." *Lopez v. Candaele*, 630 F.3d 775, 785-786

(9th Cir. 2010).

## IV.   ARGUMENT

### A. Plaintiff Is Likely to Succeed on the Merits

"[T]o state a claim against a government employer for violation of the

First Amendment (retaliation), an employee must show (1) that he or she

was engaged in protected speech, (2) that the employer took 'adverse

employment action', and (3) that his or speech was a substantial or

motivating factor 'for the adverse employment action." *Turner v. City &*

*Cnty. Of S.F.*, 788 F. 3d 1206, 1210 (9th Cir. 2015) (quoting *Coszalter v. City*

*of Salem*, 320 F. 3d 698, 973 (9th Cir. 2003).

The government bears the burden of proving the constitutionality of

its actions when it restricts speech. *United States v. Playboy Entm't Grp.,*

*Inc.*, 529 U.S. 803, 816 (2000). Defendant W.S.R.S.L. cannot meet its

burden here.

The First Amendment binds public universities like Defendant U.H.,

including its investigations and pursuit of disciplinary sanctions. *Healy v.*

*James,* 408 U.S. 169, 180 (1972) ("[T]he precedents of this Court leave no

room for the view that, because of the acknowledged need for order, First

Amendment protections should apply with less force on college campuses

than in the community at large. Quite to the contrary, 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American Schools.'").

The Supreme Court has recognized that speech addressing racial discrimination in a government workplace is "a matter inherently of public concern." *Connick v. Myers,* 461 U.S. 138, 148 n.8, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). Building on this, the Ninth Circuit has explained, "[d]isputes over racial, religious, or other such discrimination by public officials are not simply individual personnel matters. They involve the type of governmental conduct that affects the societal interest as a whole conduct in which the public has a deep and abiding interest." *Alpha Energy Savers, Inc. v. Hansen*, 381 F. 3d 917, 926-27 (9th Cir. 2004). Because Plaintiff's speech involved speaking out against racial discrimination, it was protected as political speech and involving a matter "inherently of public concern." *Connick,* 461 U.S. at 148 n.8.

Although Plaintiff disputes calling anyone names in the faculty meeting, even if true, the law is clear "[o]pinions are constitutionally protected…" *Daniels v. Wayans*, 8 Cal. App. 5th 367, 397, 213 Cal. Rptr. 3d 865 (2017). In *Dodge v. Evergreen School Dist. #114,* the Ninth Circuit noted the Defendant school principal had a First Amendment right when she

called Plaintiff Dodge, to his face, "a racist, a bigot, a homophobe, and a liar and swore at him for having his MAGA hat with him again [at teacher training session]." *Dodge*, 56 F. 4th 767 at 779 and citing *Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998), the Ninth Circuit held that "principal Garret also has First Amendment rights after all…(It would be the height of irony, indeed, if mere speech, in response to speech, could constitute a First Amendment violation."). *Dodge* at 779.

Professor Lawson is likely to succeed on the merits under the First Amendment. Both the Ninth Circuit and the Supreme Court have repeatedly held "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L.Ed 2d 547 (1976)). "The harm is particularly irreparable, as here, [Plaintiffs] seek to engage in political speech." *Id*.

## B. Academic Freedom Protects Professor Lawson's Speech at the Faculty Meeting and His Use of the Listserve to Call for a Boycott.

Plaintiff's speech falls under the Academic Freedom Exception to the First Amendment. In *Demers v Austin,* 746 F.3d 402 (9th Cir. 2014), the Ninth Circuit held that *Garcetti's* "official duty" test does not apply to teaching and academic writing performed pursuant to the official duties of a

public school teacher or university professor. *Id*. at 418. Under *Demers*, it is highly relevant that Plaintiff's speech to his faculty colleagues focused on matters he has written and taught extensively as a law professor. Lawson Decl. ¶ 15. Plaintiff's speaking and responding to the D.E.I. committee's racially insensitive Black History Month Flyer sent out on the listserve is of public concern. Plaintiff's action following his speech at the meeting further demonstrates it was a matter of public concern. Plaintiff memorialized what he spoke on at the February 17, 2023, meeting in his February 18, 2023, email to the Dean and D.E.I. committee members. On February 21, 2023, he and BLSA used Plaintiff's email from February 18, 2023 to call for a boycott.

The evidence of Plaintiff circulating the February 18, 2023 email on the Law School listserv when he and B.L.S.A. called a boycott, is evidence the Ninth Circuit looks at in analyzing whether the speech was a matter of public concern. For example, in *Candelaria v. City Tolleson* 721 Fed. Appx. 588 (9th Cir. 2017), in finding that Plaintiffs speech was not a matter of public concern, the Ninth Circuit noted that the plaintiffs in the case "***did not attempt to publicize their speech beyond the fire department.*** *See also*, *Desrochers v. City of San Bernardino,* 572 F.3d 703, 712 (9th Cir. 2009) (Emphasis added) the Ninth Circuit noted that:

We have recognized, however, that "[a] limited audience weigh[s] against [a] claim of protected speech." See *Roe*, 109 F.3d at 585; *McKinley*, 705 F.2d at 1114 (The result in *Connick* is also explained by the fact that the employee did not seek to inform the public about the operation of a public agency." The relevance of non-disclosure to the public tracks the Supreme Court's acknowledgment that "the public's interest in receiving the well-informed views of the government employees engaging in civic discussion: is one of the primary purposes of its First Amendment retaliation jurisprudence. *Garcetti*, 547 U.S. at 419. 'Public speech is more likely to serve the public values of the First Amendment. Private speech motivated by an office grievance is less likely to convey the information that is a prerequisite for an informed electorate." *Weeks* 246, F.3d at 1235. Thus, though "a private complaint may relate to a matter of public concern, our consideration of the form Desrochers and Lowes adopted to convey their message "help[s us] identify [whether their] speech…is of public concern…Because the speech at issue took the form of internal employee grievances ***which were not disseminated to the public***, this portion of the *Connick* test cuts against a finding of public concern.
*Id.* at 714-15. (Emphasis added).

The facts and law support that Plaintiff spoke on a matter of public concern and "disseminated that concern to the public" via the listserv when he called for boycott of the event. Unlike in *Desrocher*, here, Plaintiff's speech was more than a private complaint. His speech extended beyond the initial grievance expressed during the faculty meeting. The listserv is a forum that extends to all members of the Law School community. Lawson Dec. ¶ 47. Further, news of the boycott, and Plaintiff's reasons for initiating it, was spread beyond members of the listserv via form Plaintiff adopted to convey his speech indicates that it is a matter of public concern—he made

the broader community aware and extended an invitation for additional

speech and input from the community on this matter of public concern.

The Ninth Circuit's case law protects robust speech on race and has

held that such speech will very seldom constitute harassment:

> "[T]eaching and academic writing are at the core of official
> duties of teachers and professors. Such teaching and writing are
> 'a special concern of the First Amendment." *Demers v. Austin*,
> 746 F. 3d 402, 411 (9th Cir. 2014) (quoting *Keyishian v. Austin*,
> 746 F. 3d. 402, 411 (9th Cir. 2014) (quoting *Keyishian v. Bd. of
> Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603, 87
> S. Ct. 675, 17 L. Ed. 2df 629 (1967). Accordingly, the First
> Amendment robustly protects acts of public expression by
> academics on matters of public concern. "The desire to
> maintain a sedate academic environment…[does not] justify
> limitations on a teacher's freedom to express himself [or
> herself] on political issues in vigorous, argumentative,
> unmeasured, and even distinctly unpleasant terms." *Adamian v.
> Jacobsen*, 523 F. 2d 929, 934 (9th Cir. 1975). **Accordingly, the
> Ninth Circuit has stated that it "doubt[s] that a college
> professor's expression on a matter of public concern,
> directed at the college community, could ever constitute
> unlawful harassment" justifying judicial intervention.**
> *Rodriguez* v. *Maricopa County Cmty. College Dist.*, 605 F. 3d 703 at
> 710 (9th Cir. 2009) (Emphasis added)

Those principles are squarely implicated here where the Law School's

D.E.I. committee circulated a racially-biased Black History Month flyer

celebrating Dr. King's letter from the Birmingham Jail that excluded Black

law students, Black activists, Black Civil Rights lawyers. It excluded Black

people, period. In *Dodge v. Evergreen School Dist. #114*, 56 F. 4th 767 (9th

Cir. 2022), even though the faculty members who attended the two-day

faculty training sessions were "upset", "crying" and "afraid" of Dodge by his wearing and bringing his MAGA hat to the faculty training session, even after being warned not to, the Ninth Circuit, in ruling that Dodge's speech was protected, found "no evidence that Dodge's hat 'interfered with the teacher training session... beyond the disruption that necessarily accompanies' [controversial] speech." (quoting *Keyser v. Sacramento City Unified Sch. Dist*, 265 F.3d  741 at 749. and both training sessions were completed without incident." *Dodge* at 29. The Ninth Circuit also noted that there was no disruption in the school. In the case at hand, there was no disruption in the faculty meeting as it lasted 4-5 hours after Professor Lawson spoke. Lawson Decl. ¶ 41. No faculty member left the meeting because of Professor Lawson's speech. . No classes were canceled. There was no disruption in the operations of the Law School.

### C. **Plaintiff Suffered an Adverse Employment Action**

The Ninth Circuit has repeatedly held that to constitute an adverse employment action, a government act of retaliation need not be severe, and it need not be of a certain kind. Nor does it matter whether an act of retaliation is in the form of the removal of a benefit or the imposition of a burden. In *Allen v. Scribner*,812 F. 2d 426 (9th Cir. 1987) the Plaintiff alleged that he had been "reassigned to another position, and otherwise

harassed in retaliation for . . . remarks he made to the press." *812 F. 2d at 428.* The court found this allegation sufficient to form the basis of a First Amendment claim. In *Thomas v. Carpenter,* 881 F.2d 828, 829, (9th Cir. 1989) the Plaintiff alleged that he had been banned from attending certain meetings and participating as an evaluator in training exercises in retaliation for his political activity. The Ninth Circuit found this allegation sufficient. In *Ulrich v. City and County of San Francisco*, 308 F. 3d 968 at 977. The Plaintiff alleged that his government employer had subjected him to an investigation, refused to rescind his resignation, and filed an adverse employment report in retaliation for his protected speech. Again, the court found that his allegation was sufficient to state a § 1983 claim seeking redress for violation of First Amendment rights. In *Anderson v. Central Point School District*, 746 F. 2d 505, 506 (9th Cir. 1984), the Plaintiff alleged that he had been temporarily suspended from his coaching duties and insulted by his employer. The Ninth Circuit allowed the Plaintiff to recover under the First Amendment for emotional distress and damage to his reputation. *Id.* The Ninth Circuit stated in *Carpenter* that the relevant inquiry is whether the state had taken "action designed to retaliate against and chill political expression." *881F. 2d at 829* (quoting *Gibson v. United States* 781 F. 2d 1334, 1338 (9th Cir. 1986)). Or, as the Ninth Circuit had

22

earlier stated in *Allen*, the inquiry is whether "the exercise of the First Amendment rights was deterred" by the government employer's action. *812 F. 2d at 434 n. 17.*

For Plaintiff's speech to be actionable harassment or create a hostile work environment, it requires both (1) that the victim subjectively assess the conduct, in the totality of circumstances, as harassment and (2) the conduct is unwelcome, severe, and pervasive. *Saxe v. State Coll. Area School Dist.*, 240 F. 3d 200, 205 (3rd. Cir. 2001) (citation omitted); *Rodriguez,* 605 F. 3d at 708 ("There is no categorical 'harassment exception' to the First Amendment's free speech clause."). For the totality of the circumstances, courts have stated that harassment does not include mere "utterance of an epithet" or discourtesy or rudeness: that does not create an objective change in conditions of employment. *Saxe*, 240 F.3d at 205 (quoting, in part, *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). Plaintiff's comments were not objectively offensive because they represent criticism on an issue of current political and cultural debate, nor were they pervasive because they were non-recurring isolated instances. *Mosavi v. Mt. San Antonio Coll.*, 805 F. Apo'x 502, 504 (9th Cir. 2020) ("[A]n isolated incident would not constitute severe and pervasive harassment.") U.H.'s policy does not punish "isolated instances" unless they are "extremely

23

severe." EP 1.202 C(2). **Exhibit 3.**

### D. Plaintiff Is Suffering Irreparable Harm

Defendants are chilling Plaintiff's speech. Plaintiff is refraining from speaking out on systemic racism that has persisted at the Law School. Lawson, Decl. ¶. This chilling of Plaintiff's speech harms him irreparably. As the Supreme Court held, "The loss of First Amendment freedoms, for even a minimal period of time, unquestionably constitutes irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 373 (1976); accord *Klein v. City of San Clemente*, 584 F. 3d 1196, 1207-08 (9t Cir. 2009), cert. denied, 559 U.S. 972 (2010). *See also Goldie's Bookstore, Inc. v. Super. Ct. of California*, 739 F.2d 466, 472 (9th Cir. 1984) ("An alleged constitutional violation will often alone constitute irreparable harm."). Plaintiff will continue to suffer these harms unless this Court enjoins Defendants.

Plaintiff should not have to risk further investigations for allegations of creating a hostile work environment for addressing race discrimination at the Law School or responding to faculty members who make racially insensitive comments.

### E. The Balance of Equities Tips Sharply In Plaintiff's Favor

Defendant would suffer no discernable harm by the issuance of an injunction, and the balance of equities tips decidedly in favor of a

preliminary injunction. See *Int'l Soc'y for Krishna Consciousness v. Kearnes*, 454 F. Supp. 116, 125 (E.D. Cal. 1978) (ruling, in a discussion on the First Amendment, that the existence of constitutional questions "weighs heavily in the balancing of harms, for the protection of those rights is not merely a benefit to plaintiff but to all citizens").

V.      **<u>A Preliminary Injunction Is in The Public Interest</u>**

Securing constitutional rights is clearly in the public interest, and courts have consistently recognized the significant public interest in protecting fundamental rights. This is especially true when it comes to academic freedom on college campuses. The issue of race, unconscious bias, implicit bias and "nice racism" are matters of public concern.

VI.     **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that Court grant Plaintiff's Motion for a Temporary Restraining Order or Preliminary Injunction.

DATED: Honolulu, Hawaii, September 6, 2023.

/s/Kenneth L. Lawson
Kenneth L. Lawson