IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAI'I

| | |
|---|---|
| KENNETH L. LAWSON,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY OF HAWAI'I; MICHAEL BRUNO; CAMILLE NELSON; JOHN AND JANE DOES 1-7; WILLIAM S. RICHARDSON SCHOOL OF LAW FACULTY MEMBERS AND/OR FORMER FACULTY MEMBERS IN THEIR INDIVIDUAL CAPACITIES,<br><br>Defendants. | CIV. NO. 23-00348-LEK-RT<br><br><br><br>DECLARATION OF KENNETH L. LAWSON AND EXHIBITS 1-31 |

## DECLARATION OF KENNETH L. LAWSON

I, Kenneth L. Lawson, hereby declare:

1. I make this declaration based on my own personal knowledge, and if called to testify, I could and would do so competently as follows:

2. I am the plaintiff in this case.

3. On February 27, 2023, I received a Notice of Investigation from Defendant Bruno stating that I was being investigated for creating a hostile work environment. On March 28, 2023, I received an Updated Notice of Investigation claiming that I had also engaged in misogyny. Pursuant to the Notices of Investigation, I was ordered to have no contact with certain

individuals and banned from the William S. Richardson School of Law ("W.S.R.S.L.") campus, which forced me to direct my two clinic programs, advise all my students, supervise student organizations, exchange ideas with fellow facuty, and teach all my classes from my home (which happened to in the early stages of major renovation). Unlike other members of the W.S.R.S.L. faculty, I have been prohibited from using the W.S.R.S.L. listserve to communicate with members of the W.S.R.S.L. community, without securing express prior approval. Because of the Notices of Investigation, I have been fearful of speaking out generally on potentially sensitive issue of public importance and particularly on Defendants' discriminatory use of U.H.'s faculty classification system to violate state and federal law requiring equal pay for equal work.

4. In the Notices of Investigation, Defendant Bruno refers to specific U.H. Policies and collective bargaining agreement to justify violating my First Amendment right to free speech and banishing me from the W.S.R.S.L. campus. True and accurate copies of all the relevant policies, as accessed from Defendant U.H.'s website, are attached as Exhibits as follows:

    **Exhibit 1** - Administrative Policy 1.202;

    **Exhibit 2** - Executive Policy EP 9.210, Workplace Non-Violence

2

Policy;

**Exhibit 3** - Executive Policy EP 1.202, Nondiscrimination, Equal Opportunity and Affirmative Action Policy;

**Exhibit 4** - Sex and Gender Misconduct Policy EP 1.204,

**Exhibit 5** - A true and accurate copy of the University of Hawaiʻi Professional Assembly Collective Bargaining Agreement, Article XVIII, B.6. of the Unit 7 collective bargaining agreement.

5. I have never received a hearing to determine if there is cause for such restrictions. There is no appeal process for the banishment, general chilling of my speech rights, or specific restrictions on my speech. I have respectfully asked for reasonable accommodation to access confidential files necessarily located on the W.S.R.S.L. campus or to teach my classes in person (offering to have security escort me to and from the classroom each time), only to have Defendants deny or ignore these requests without any explanation or process.

6. After more than five months of banishment and limited speech rights, I was finally interviewed on August 8, 2023, by investigators appointed by Defendant Bruno to investigate the allegations contained in the Notices of Investigation. A true and accurate copy of my summary statement is attached to my declaration as **Exhibit 18**. I declare that my summary

statement to the investigators is based on my personal knowledge, and if called to testify, I could and would do so competently. I incorporate that summary (as if fully rewritten) herein.

7. I am a full-time classroom instructor, Co-Director of the Hawai'i Innocence Project ("H.I.P.") clinic and Director of the Beyond Guilt Hawai'i ("Beyond Guilt") clinic, both of which clinics are located on the W.S.R.S.L. campus. In June 2020, I filed a grievance against W.S.R.S.L. for misclassification, backpay for teaching years of overload without payment, and inequity in pay.

8. That matter was settled with the specific understanding that U.H. would compensate me for years of back pay stemming from its failure to pay what should have been an automatic pay increase when I was appointed Co-Director of H.I.P.

9. During settlement talks, Defendant U.H., through their counsel and Defendant Nelson, told me that if I considered myself also deserving of a merit or equity pay increase, I would have to go through the Collective Bargaining Special Salary Adjustment ("S.S.A.") process, which required that the rest of the W.S.R.S.L. faculty agree that I deserved an equity and/or merit raise.

10. I went through the S.S.A. process and secured faculty

approval for merit *and* equity pay increases.

11. Despite faculty voting in favor of my S.S.A., Defendant Nelson denied my S.S.A.

12. This apparently was the first time in W.S.R.S.L. history that a faculty member was denied an equity or merit raise by the W.S.R.S.L. dean after the faculty voted in favor of it.

13. Defendants Bruno and Nelson were both parties to settlement language specifically stating, "…**This increase to Employee's base pay is not due to the Special Salary Adjustment categories of Equity, Merit, or Market and it is not subject to the special salary adjustment procedure.**"

14. Defendants denied my S.S.A., claiming in emails and memos that the prior settlement had already addressed the question of an equity or merit increase, even though it's clear from the language in the above paragraph that the settlement did not cover the S.S.A. factors of merit and equity.

15. On February 10, 2023, I filed a grievance through the collective bargaining agreement process against Defendants Bruno and Nelson alleging, among other things, unlawful discrimination. A true and accurate copy of my Grievance is attached hereto as **Exhibit 19**. On

February 11, 2023, I filed the appropriate paperwork with the Hawaiʻi Civil Rights Commission alleging discrimination based on race, criminal record, or disability (drug addict/alcoholic in recovery). By filing with the Hawaiʻi Civil Rights Commission, I was also blowing the whistle on the illegal classification process utilized by W.S.R.S.L. to deny equal pay for equal work. As a result of the questionnaire I filed on February 11, 2023, the Hawaiʻi Civil Rights Commission issued a Charge of Discrimination against Defendant U.H. on April 19, 2023. A true and accurate copy of the signed Charge is attached hereto as **Exhibit 20.** This matter is scheduled for mediation on September 11, 2023.

16. A few days before filing this lawsuit, my attorney discovered that for at least two years, Defendants Bruno and Nelson, have combined forces with U.H. Dean Jon Osorio to champion the cause of a new clinic that, if approved by the legislature, would be located at W.S.R.S.L. and co-directed by Dean Osorio. Specifically, Defendants Bruno and Nelson, along with Dean Osorio, have submitting joint testimony with the Hawaiʻi State Legislature each of the last two years, seeking recognition and State funding for Hoʻokaulike, a Criminal Legal System Institute for Restoration and Healing ("the Institute"). Many of the Institute's apparent objectives overlap with the missions of my clinics, particularly the Beyond Guilt clinic, which

W.S.R.S.L. faculty formally approved as a permanent clinic a couple of years ago.

17. Attached hereto as **Exhibits 15, 16 and 17** are true and accurate copies of the joint written testimony as downloaded from the Hawai'i State Legislature's website at https://www.capitol.hawaii.gov/. Although other W.S.R.S.L. legal clinics are mentioned in this testimoney, there is no mention of the the H.I.P. or Beyond Guilt Hawai'i clinics in their testimonies, even though I have for years dealt directly and specifically with the over-incarceration of Native Hawaiians and minorities of color.

18. In addition to mission overlap, there is limited space and resources available at W.S.R.S.L. to house the Institute. The Institute, if approved as described in testimony from Dean Osorio and Defendants Bruno and Nelson would compete with my existing clinics for physical space and other limited resources at W.S.R.S.L.

19. I am the only Black man employed at W.S.R.S.L., in any capacity, and the only Black faculty member who was born and raised in the U.S. I have been active in the civil rights movement my entire life. Among other specific activities, I have pursued dozens of civil rights lawsuits on behalf of clients who had been discriminated against; taught law school courses in which civil rights were key components of the curricula; created a

law school Civil Rights clinic; served as Faculty Adviser to the W.S.R.S.L chapter of the Black Association of Law Students Association ("BLSA"); and authored a University of Hawai'i Law Review article on implicit bias, particularly implicit bias against Black men based on an irrational, subconscious fear of physical violence.

20. In February of 2023, W.S.R.S.L.'s Diversity, Equity and Inclusion ("D.E.I.") committee circulated a flyer announcing a Black History Month event entitled, "Reflections on A Letter From the Birmingham Jail," that the D.E.I. committee had planned and was sponsoring. Also attached to the email was a PDF of Dr. Martin Luther King, Jr.'s Letter from the Birmingham Jail. A true and accurate copy of the flyer is attached hereto as **Exhibit 6** and a true and accurate copy of Dr. King's Letter from the Birmingham Jail is attached as **Exhibit 7.**

21. Because there were no Black facilitators or panelists listed on the flyer, I raised the issue during the announcement portion of the special faculty hiring meeting on February 17, 2023.

22. The announcement portion the meeting was at the beginning of the meeting, and a number of faculty members made announcements. I then raised my hand, and Defendant Nelson recognized me and gave me the floor to speak.

8

23. After being recognized and given the floor to speak, I asked why the D.E.I. committee did not reach out to any Black people to be panelists or facilitators. At that time, Defendant Nelson said it was a mistake for the D.E.I. committee not to do so.

24. In trying to explain why the exclusion of Black civil rights attorneys, Black students, and Black activists was hurtful to many Black people, and reflected unconscious racial bias, I spoke about the history between Dr. King and Rev. Fred Shuttlesworth and how Rev. Shuttlesworth had asked Dr. King to come to Birmingham and protest Jim Crow and Sheriff Bull Connor's harsh and brutal enforcement of Jim Crow laws.

25. I also cited scholar Robin DiAngelo's work on implicit racial bias by discussing her book, *Nice Racism: How Progressive White People Perpetuate Racial Harm*. Her scholarship also focuses on unconscious racism in the workplace. Defendant Nelson told me she was familiar with DiAngelo's scholarship.

26. As I continued to talk about implicit racial bias and Nice Racism, Defendant Nelson repeatedly interrupted me, several times saying "okay it was a mistake." I took this as her trying to shield the D.E.I. committee from the embarrassment of explaining how a committee form in

9

part to combat racism had itself engaged in a form of racism.

27. As I continued to speak on the issue, at some point, a colleague, Carole Peterson, looked at the flyer's image on her cell phone and said, "I don't see this as being racist. Black people can come and share their experience." as though participating in a discussion of the Black Civil Rights movement as a member of the audience should be viewed by Black people as equivalent to serving as a panelist or facilitator for the event. I responded by describing her comment as another example of Nice Racism. I did not call her or anyone else any names in the meeting.

28. At some point I was sharing my history with Rev. Shuttlesworth when he moved to Cincinnati in the mid-1960's and pastored a church five blocks down the street from my grandmother's house. I wanted the committee and others to understand the sacrifices Dr. King and millions of other Black and White people made during that era while fighting for civil rights. I shared with them that after Dr. King was killed there were riots three to four houses up the street from where my grandmother lived, and that shortly after what started out as peaceful non-violent protest, my mother and others were beaten and arrested by racists police officers.

29. As I was speaking about these painful events, Defendant Nelson kept interrupting me and at some point she said, "Ken, as a Black

women, I too have been discriminated against, everyone in here has faced some form of discrimination." In my mind, that was like a man telling a female rape victim that her pain and trauma are no big deal because "we all have had something bad happen to us."

30. I have no doubt that Defendant Nelson has faced her share of racism and discrimination. But the Black History event was to focus on Dr. King's "Letter from the Birmingham Jail," which he wrote at the height of the U.S. Black Civil Rights movement. I told her she was not from the U.S., was not raised here under a brutal system of segregation and forced bussing, and her defense of the D.E.I. committee indicated to me that she did not really know what those of us who were victims of that system went through.

31. Carole Peterson and Defendant Nelson appeared to be angry at what I said in response to their statements.

32. After I finished my speech, Defendant Nelson asked the faculty members if they were ready to move on to the next order of business, which was the faculty hiring portion of the meeting.

33. Everyone in the meeting indicated that they were ready and able to proceed to the faculty hiring portion of the meeting.

34. The hiring portion of the meeting commenced, and a student was asked to give the "student feedback" on the candidates. When her face

appeared on the Zoom screen, she was crying and said she was so sorry for the pain the committee caused me. That student then went on to give her presentation to the faculty.

35. After the student spoke, a faculty colleague attending the meeting on Zoom, who was a member of the D.E.I. committee, apologized and told me that, being white, she could not understand my pain, but she has Black friends who shared with her similar pain from that era.

36. While I spoke and during the rest of the faculty meeting, not one person said anything like: "Ken, calm down. Ken, we feel scared. Ken, please don't name-call. Ken, you're out of line." No one told me during or after the meeting, or otherwise signaled to me that I had had been out-of-line or acted in a hostile manner. When I first started speaking, I initially had directed my comments and questions ("how could this happen?") to the members of the D.E.I. committee attending the meeting. , Rather than respond to any of my questions, the chair of the D.E.I. committee only said, "why are you looking at me?"

37. To the best of my knowledge, no one called security or 911, and no one left the meeting as a result of anything I said. The meeting lasted another four to five hours without further mention of my questions and comments during the announcement portion of the meeting. Eventually, I

had to leave the meeting to attend a scheduled dental appointment, but that took only 20 minutes. On the way to the dentist's office and after the appointment, I participated in the rest of the meeting via Zoom on my cell phone and then on my desktop computer.

38. Immediately after my remarks during the announcement portion of the meeting, I exchanged text messages with a faculty colleague who stated in one text, "I'm sorry the law school hurt you again." After the meeting a few other faculty members sent me supportive emails acknowledging my pain.

39. I also texted contemporaneously with a person outside of the faculty meeting, informing them that Defendant Nelson kept repeatedly interrupting me.

40. After my remarks, the meeting continued for an additional four to five hours, uninterrupted, except for occasional bathroom breaks.

41. Because it was a candidate hiring meeting, each faculty member was asked to comment on each candidate, and each faculty member was required to cast a vote. All faculty members participated in the discussion, and all faculty members voted on several different candidates.

42. The following week, to my knowledge, no classes were canceled because of my speech at the faculty meeting and subsequent call

for a boycott. No faculty members complained that they could not perform their duties due to my speech or my calling for a boycott of the Black History Month event. No W.S.R.S.L classes or activities were cancelled, with the exception of the event I and B.L.S.A. members were boycotting.

43. Although the Notice of Investigation accuses me of interrupting Defendant Nelson, a text message I sent to another person outside of the meeting while the meeting was in progress contemporaneously states that Defendant Nelson kept interrupting me. **Exhibit 18.**

44. On Saturday, February 18, 2023, I sent an email memorializing much of what I said in the meeting and why I said it. A true and accurate copy of the email is attached hereto as **Exhibit 8**

45. Hours after sending the email, I attended a Black History film event with my wife at the Doris Duke Theatre. While seated and waiting for the film to start, Defendant Nelson and I greeted each other as she walked up the aisle toward the concession stand. Since I was seated, she bent over slightly, touched my shoulder, and asked how I was doing. She then reached over to me, extended her hand to my wife, and introduced herself. At the time, I interpreted this as an indication that Dean Nelson's anger had subsided and that she wanted to move on from our contentious exchange

during the faculty meeting. Needless to say, I was shocked to get the Notice of Investigation days later on February 27, 2023, claiming or inferring that I had created a hostile work environment, and that Dean Nelson was listed as one of the complainants. When she stopped to greet me at the film event, touched my shoulder, asked how I was doing and introduced herself to my wife, Defendant Nelson exhibited no fear or hesitation.

46. Even though I told the D.E.I. committee at the faculty meeting that the exclusion of Blacks as facilitators or panelists for the Black History Month event was hurtful, and Defendant Nelson had repeatedly described it as a mistake, the committee appeared intent on going forward with the event as planned.

47. On February 21, 2023, the B.L.S.A. students and I used the W.S.R.S.L. listserve to call for a boycott. A true and accurate copy of the boycott email is attached as **Exhibit 9.**

48. The Law School's listserv is routinely used by faculty to make announcements of interest to the W.S.R.S.L. community. To my knowledge there are no explicit rules on what type of announcement can be made.

49. Hours after we called for a boycott, three female faculty members sent an email with a memo attached, Carole Peterson, Kapua Sproat and Linda Kreiger. Their memo falsely accused me of name-calling

at the faculty meeting. Within minutes of reading the email, I responded, "come at me all you want, but don't lie on me. I did not call anyone names." A true and accurate copy of that email chain and the memo that was attached to the email is attached hereto as **Exhibit 10 and 11**, respectively.

50. I did not respond to their email because they were female. I responded because they lied when they claimed I was name-calling at the meeting.

51. The following day, February 22, 2023, two faculty members of the D.E.I. committee circulated what I think of as a "Gaslight" memo. A true and accurate copy of the "Gaslight" memo is attached as **Exhibit 12.**

52. The next day, two other faculty members, Charles Booth (Carole Peterson's husband, who had been sitting right next to me at the February 17, 2023 faculty meeting) and Mark Levin, joined in the call for new rules at faculty meetings. A true and accurate copy of the email is attached as **Exhibit 21.**

53. On the morning of February 27, 2023, at approximately 8:00 a.m., I received the Notice of Investigation from Defendant Bruno via email. A true and accurate copy of the Notice of Investigation is attached as **Exhibit 13**, and a true and accurate copy of the Updated Notice of Investigation is attached as **Exhibit 14.**

54. Since then, U.H. had denied or not responded to my repeated requests to mediate all the legal issues, and hopefully at least begin to heal personal relationships, instead of litigation. I have repeated pointed out the litigation would not be good for me, any of the Defendants, or, and most importantly, W.S.R.S.L.'s past, present and future students.

55. I believe I have exhibited good faith by repeatedly seeking Defendants' agreement to mediate all the issues and waiting six months before filing my Complaint in this matter. I finally did so only when Defendants refused (a) to enter into mediation of all the issues, (b) to replace Dean Osorio with a nonconflicted Decision Maker in my investigation, and (c) even just to agree not to let Dean Osorio decide my fate prior to a mediation that could include discussion of Dean Osorio's obvious conflicts of interest in this matter. A true and accurate copy of correspondence from my attorney, William H. Harrison to Defendants is attached as **Exhibit 22.**

56. A true and accurate copy of FIRE's letter to Defendant U.H. is attached hereto as **Exhibit 23.**

57. On July 10, 2023, Attorney Harrison sent Defendant Bruno and Dean Osorio a draft complaint, again requesting reasonable accommodations to return to work. A true and accurate copy of Mr. Harrison's July 10, 2023, correspondence is attached as **Exhibit 24** and

Defendants' response is attached as **Exhibit 25.**

58. My reasonable request to work in my clinic office to work on specific client cases was denied even when I offered to go in only after 10 P.M. and leave before 6 A.M. the the following morning and work on weekends.

59. I am teaching two bar courses this semester, Evidence and Criminal Procedure, as well as managing my two clinics. Because it's far better for the students to learn in person, as opposed to online, I told Defendants that I'm willing to have either the Associate Dean of academic affairs at W.S.R.S.L. or U.H. Security meet me at the W.S.R.S.L. property line and escort me to class, and then when class is over, escort me off W.S.R.S.L. property. This, too, was denied. A true and accurate copy of the July 26, 2023, letter that Attorney Harrison sent to Defendants is attached as **Exhibit 26** and a true and accurate copy of Defendants' denial is attached hereto as **Exhibit 27.**

60. When Attorney Harrison discovered the conflicts of interest and relationship regarding Defendants Bruno and Nelson, and Dean Osorio, he immediately sent a letter to U.H. counsel requesting a neutral and fair Decision Maker be appointed and he made another attempt at mediation. Concerned that Osorio as Decision Maker could issue a decision terminating

me, Attorney Harrison gave U.H. counsel a deadline to respond. A true and accurate copy of Attorney Harrison's August 17, 2023, letter is attached as **Exhibit 28**.

61. Defendants' counsel stated that they could not respond until somewhere around August 28, 2023, and that they were not willing to have the Decision Maker agree to hold any decision in abeyance until my requests for an unconflicted Decision Maker and mediation of all the issues could be addressed. A true and accurate copy of the email chain between Counsel for Defendants and Attorney Harrison are attached as **Exhibits 29**.

62. I felt compelled to file my lawsuit because of Defendants' unwillingness to hold the decision in abeyance until the conflict issue could be addressed and resolved.

63. Prior to filing my motion for preliminary injunction, I requested a pre-filing conference with counsel for Defendants.

64. Counsel for defendants said Defendants would mediate but only with attorneys present—specifically no clients—which he said would exclude direct participation by me in my own mediation. Moreover, counsel for Defendants described as his clients' position, that Osorio has no conflict, and that even if I agreed to mediation, only selected issues could be raised and that his clients would not agree to instruct Dean Osorio to not make any

decision in my case until the parties had attempted to mediate all pending issues. Counsel for Defendants' September 1, 2023, letter about the pre-filing meeting is attached as **Exhibit 30**. A true and accurate copy of my September 6, 2023, reply letter is attached as **Exhibit 31**.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of September, 2023, in Honolulu, Hawai'i.

_Kenneth Lawson_
Kenneth L. Lawson