# EXHIBIT 18

The following is summary of the interview with Ken Lawson, Faculty Specialist, Co-Director of the Hawaii Innocence Project, and Director of the Behind Guilt Legal Clinic at William S. Richardson School Law pertaining to the alleged violations of the University of Hawai'i's Executive Policy EP 9.210, Workplace Non-Violence; Executive Policy 1.204, Sex and Gender-Based Misconduct; Executive Policy 1.202, Nondiscrimination, Equal Opportunity and Affirmative Action by Kenneth Lawson. Dean Jonathan Osorio is the decision-maker in this case.[1]

I sent this statement via email, and with it, I also attached the following exhibits:

> A. 8-17-23 letter sent to UH counsel from my counsel regarding Dean Osorio's conflict of interest in being appointed the "decision-maker" in this case.
> B. Concerning the allegation of misogyny, a June 14, 2022, letter I sent the Deans and Provost Bruno advocating for a white female colleague to be reclassified and receive equal pay for equal work.
> C. Concerning the allegation of misogyny, an email chain to the Law School's male Associate Dean of Academic Affairs, Nick Mirkay, where I cursed in it and copied Provost Bruno about my concerns re: the discriminatory treatment against a white female colleague.
> D. Concerning the allegation of misogyny, the email chain where I made a complaint to UH's Title IX office and to UH's EEO of discrimination on behalf of a white female colleague. Please note that UH's Title IX office and the EEO office still have not responded to the complaint of sex discrimination made over a year ago.

We got an email dated February 13 from Nick Mirkay, our Associate Dean, canceling our regular faculty meeting and encouraging us to prepare for a special faculty meeting on February 17. The email stated that the beginning of the meeting would be announcements, and then we would move to the hiring portion of the meeting. I attended the faculty meeting on February 17, 2023. I attended in person, then I had a dentist appointment and attended via Zoom on my way to the dentist. After the dentist, I joined via Zoom as I drove home. I arrived home and continued to attend the meeting via Zoom. The meeting lasted about five hours. I was there in person for about an hour, and then had to leave for my dental appointment. During the announcement section, I spoke. I stayed a half hour after that to make sure I made my dental appointment on time.

---

[1] Attached to the email that I sent with my statement to the investigators is a copy of the letter and attachments my attorney sent to UH counsel demonstraitng a serious conflict of interest and evidence where a reasonable person could find that the investigtaion was decided before it even began. Because UH counsel was present for my entire inteview and becaue counsel just discovered this serious conflict and supporting evidence, I'm not providing my changes in "track changes". Reasonable minds can conclude that Provost Bruno, Dean Osorio and Dean Nelson are using this process to retialate against me for the prior and pending complaints and for exercising my First Amendment Rights to Free Speech and Assembly.  I understand that the issue of First Amendement Retialation is beyond the scope of this investitigation, but because UH has so far refused to try to resolve this mattter, Court intervenion is necessary.

By the time I left for the meeting room for my dental appointment, the hiring portion of the meeting had been going for about a half-hour. When I left the physical meeting room, I got on Zoom, attended the meeting, got in my car, and drove to the dentist's office at the Kāhala Mall. I turned off Zoom during my appointment. I joined the meeting via Zoom after my appt., which lasted about a half-hour. Drove home while attending the meeting on Zoom. I got home and continued the meeting via Zoom. I was called on and participated in the discussion of the candidates and the hiring voting with the rest of the faculty.

At the February 17 meeting, the Dean allowed several faculty members to make announcements. I raised my hand to speak during the announcement portion of the meeting. The Dean gave me the floor to speak. I then stated that I would like to address The Diversity Equity and Inclusion (DEI) committee, which circulated a flyer for Black History Month announcing a Black History Month event, and it would be on Dr. King's Letter from the Birmingham Jail. I wanted to know why no Black people were listed as facilitators at the event. Black law students also told me they had not been consulted or asked to participate in the Law School's Black History Month Event about the U.S. Black Civil Rights movement. No Black civil rights attorneys, Black Civil Rights activists, Black Law Students were asked to be facilitators. I did not mention not asking me to be a facilitator at the meeting. The Notice incorrectly alleges that I was mad that I was not asked to be a facilitator. At the meeting, I reviewed a list of local people the Committee could have invited to facilitate. I discussed the history of the U.S. Black Civil Rights movement and my history with the U.S. Black Civil Rights movement to show the faculty why excluding Blacks from being facilitators was racist and hurtful..

Again, the Dean gave me the floor to speak during the announcement section of the meeting, but after I started speaking, she kept cutting me off and interrupting me. The email from my colleague shortly after the meeting confirms this. My colleague wrote, "Camille's inartful attempts to shield committee members (whether from embarrassment or as a substantive matter) raised further questions in my mind." All of my comments to Camille were in response to what she said to me during the numerous times she interrupted my speech after giving me the floor.

While the meeting was still going on, I texted someone outside the meeting about Camille interrupting me. I have cut and pasted the image below. This also demonstrates, in real-time, what I said and why I said it. In court, I can and will demonstrate that I sent the text messages below to someone else who was not faculty while the February 17, 2023, faculty meeting was ongoing.



Fri, Feb 17 at 3:48 PM

██████████████████████ Camille
is really pissed at me now

Oh no! What happened?

Are you still in the meeting!?!?

Yep

Good lord

Did you bring up the event or is there something else she is mad about?

She tried to cut me off and minimize what I was saying. Which is that the committee was disrespectful to blacks and the civil rights movement she tried to say we we all have been through things. I told her that she wasn't raised here no was she bussed to school like me. She never got arrested twice like me, she was never tear gassed or beaten. Nor did she see her mom beaten with a police baton for demonstrating so she has no clue to why this is so disrespectful to the black civil rights movement



She tried to cut me off and minimize what I was saying. Which is that the committee was disrespectful to blacks and the civil rights movement she tried to say we we all have been through things. I told her that she wasn't raised here no was she bussed to school like me. She never got arrested twice like me, she was never tear gassed or beaten. Nor did she see her mom beaten with a police baton for demonstrating so she has no clue to why this is so disrespectful to the black civil rights movement

Wow! She tried to cut you off when you were saying something so personal? How is she not receptive to your experience? Or anyone else for that matter

Did anyone come to support you???

Again, the above-embedded text was contemporaneously written on February 17, 2023, while the meeting was still in progress. Backing up a bit, What I said to the DEI committee and the rest of the faculty, is also memorialized in the email I sent the following day after the meeting, February 18, 2023. I sent the email to Camille and the DEI committee. By the DEI committee choosing to discuss King's Letter from The Birmingham Jail for the Law School's Black History Month event without having any Black people facilitate is why, I explained, this was extremely hurtful and racist. I was pointing out that the DEI committee engaged in unconscious racial bias, i.e., "Nice Racism". By racism and being racist, I don't mean they intended to be intentionally hurtful or racist. Instead, by not reaching out to the Black community, to local Black civil rights leaders, or the Black law students, that was unconscious racism and implicit bias. Nice Racism or implicit bias, by definition, means it lacks specific intent. Why was this Nice Racism? As I said above, there has never been an event based on race, sexual orientation, or culture at the law school that did not include someone from that race, community, or culture on the panel.

For example, when there is an event at the Law School on Native Hawaiian historical issues, there is always someone from the Native Hawaiian race on the panel. There has never been an event at the Law School about Jewish history where Jewish people were not part of the panel. There has never been an event at the Law School about Japanese Civil Rights and the WWII Internment Camps where the Japanese were not represented on the panels. There has never been an event at the Law School on the rights of

4

LGBQT+ where no one from that community was on the panel. I wanted to know what it was about the Black race, about my race, that the Law School would have an event for Black History Month about the U.S. Black Civil Rights movement and have no Black people as facilitators. I told them they could have talked to some of our Black Law Students, Black Civil Rights lawyers in the community about the event, a local Black Activist, and a former Black Judge. (At some point during the discussion, Camille acknowledged knowing the Black Judge), and she also acknowledged being familiar with Robin DiAngelo's scholarship and book, "Nice Racism." My history with Civil Rights is why I'm so passionate about this. By excluding Blacks from facilitating the talk about Dr. King's letter from the Birmingham jail and the US Black Civil Rights movement, they were implicitly saying that they didn't need to have any Black people at the law school or Black Civil Rights attorneys or Black Activist to be facilitators because: "we know your culture so well, we can teach it for you." Sort of like the non-Black person who thinks it's okay to say the word nigger because they have a lot of Black friends. Cultural appropriation is another term that comes to mind.

Again, I support all races and sexes in fighting for equal rights, and I fight for equal rights for all people. For example, a few years ago, there were protests at Mauna Kea. The then Law Dean told us (UH employees) not to go to Mauna Kea and protest because the State Legislature did not want state funds to pay employees to go the Mauna Kea. I have been involved in protests since I was five years old. I told the Dean I was going anyway. He told me I was asking for trouble. This is the "Good Trouble" that the late Congressman and U.S. Black Civil Rights activist John Lewis used to speak about. I went to the Big Island several times, where I peacefully protested and taught U.S. Black Civil Rights classes, such as the history of COINTEL PRO. There was a division in our State amongst the Native Hawaiians between those who wanted the telescope to go up and those who didn't. I thought the Law School should host a debate to discuss this division. Sam King, III, a former student of mine, contacted me, and we discussed having a debate at the Law School. Sam King and a former Governor would debate as one team in support of building the 30-meter telescope on Mauna Kea, and I would find two other Native Hawaiians who would argue why it's wrong to desecrate the sacred Manau Kea by building the telescope on Mauna Kea. Before I put the debate together, and out of respect for my Native Hawaiian colleagues, I called Kapua to seek her consent and input. Kapua said that she didn't want this type of debate at the law school and was adamant that I not proceed with it. I shut it down and let Sam King know that my Native Hawaiian colleagues did not want this type of debate at the Law School. Why did I reach out to her? Because I did not want to do anything that she and other Native Hawaiian colleagues would feel was disrespectful to their race and culture. So, while lecturing on unconscious racial bias and the U.S. Black Civil Rights movement at the 2-17-23 meeting, I repeated that incident, speaking directly to Kapua (who was on Zoom), and used it as an example of what it looks like to be conscious enough not to take another race for granted. My point then, as it is now, we need to be careful not to offend another race or sex by thinking that because we are people of color or liberal, we

5

know what it means to be Native Hawaiian, Asian, female, male, Black or White when we do not belong to those races, sex or culture.

I wanted to know what made them (DEI committee) think they could take the Black Race for granted and do to us what they would not do to any other race or culture at a Law School event. That being the Committee creating a Black History Month event about the U.S. Black Civil Rights Movement and not having any Black people facilitate it. I discussed Robin D'Angelo's book entitled, "Nice Racism," which talks about unconscious racial bias in the workplace. We pride ourselves on being a very liberal law school, open to all people. Last year we did not have one Black student admitted into the 1l class. I'm the only Black man employed as a faculty by the law school. I'm the only Black man employed at the law school in any capacity. Suppose something about the Black race comes up. In that case, I have to say something or I feel compelled to say something so people don't get the wrong impression that certain things are okay to do to or say about Black people, for example, show monkeys in suits to your Black or Native Hawaiian audience. If I don't say something, I'm guilty of allowing the myths and lies about the Black race to continue unchallenged. Black female author Zora Neale Hurston once said: "If you are silent about your pain, they'll kill you and say you enjoyed it." I'm not silent about my pain. The Committee could have talked to Black civil rights lawyers, activists, or students about sitting on the panel. For the Committee not to think about inviting Blacks to facilitate is unconscious racial bias, "Nice Racism" or Implicit Racial Bias. No matter what you call it, it's just plain wrong, and it was hurtful.

The Notice of Investigation makes it seem like I was going off in the meeting and out of control. It attempts to portray me as the "Angry Black Man, which = "Violent Black man." Everyone can envision an "Angry Black man" as a "Violent Black man." This is because, for years, people have been conditioned to believe that Black men who speak passionately about race are violent and dangerous. In large part, this is what makes it implicit racial bias. When I read the Notice of Investigation, I saw myself described as an angry Black man foaming at the mouth. It reminded me of situations where I represented Black people in police shooting cases where the officers who killed unarmed Black people would write reports that made the Black person sound like they were dangerous in order to justify the murder. A similar incident to my situation made national news a few weeks ago when U.S. Rep. Marjorie Taylor-Greene accused her Black colleague, Rep. Jamaal Bowman, of similar hostility. I will discuss it later in this statement. If I had thought of this incident during our interview, I would have used this as an example of this process. The irony is that some faculty members making these allegations against me are self-proclaimed fighters for racial justice. Yet, they are using the same racist tropes and dog whistle language that white racists have used, and continue to use, against Black men since slavery. The Notice of Investigation twists my words to make it appear that I'm violent and/or threatened violence. They use my physical appearance and natural mannerisms to portray me as a Big Black Vicious Animal. Interview the Law School's impliict bias expert, Justin Levinson, about these words and images and how they create an implicit bias that allows people to see my

frustration, hurt, and passion as violence, but if a white man says the same thing, with the same amount of passion, then he's viewed as being passionate about his belief, but not violent.

One of the allegations in the Notice of Investigation is that I responded to the female faculty members' emails, but not those from the male faculty members. First, let me say this, I did not respond to the email because they were women. I responded because they lied on me by saying I was name-calling at the meeting. A cursory review of my email responses to the women shows that I addressed the blatant lie in their emails. My response had nothing to do with them being women. Had the men lied on me, they would have gotten the same quick response. I can't stop the faculty from creating rules of conduct for faculty meetings, so "come at me all you want, but just don't lie on me" was my response, which is not a veiled threat. Yet, it's being weaponized as a dog whistle to make the Black man appear violent.

On Saturday, February 25, and on Sunday, February 26, I drafted a response memorandum to address the two or three emails from the faculty (women and men) I had received. On February 26, I emailed three people the draft for their review with the understanding that I would be sending it on Monday, February 27, on the faculty email listserv. I emailed the draft to those three people individually on Sunday, a day BEFORE, the Notice of investigation was sent out. I was notified via the Notice of Investigation the following Monday, February 27, that I couldn't use the Listserv or contact certain faculty members. So I did not send it. The investigators asked if I would be willing to give them the names of the individuals I sent my draft memo to and if I would be willing to share the entire Memo. I responded that I would like to consult my attorneys before disclosing the individuals The emails and draft memo are important because it proves or will prove in court that I intended to respond to all the emails from both men and women.

Because the investigators could not understand the select parts of the 2-26-23 Memo I read (because I was reading way too fast), I have cut and pasted a select portion of the Memo below in italics and blue font, including what I read to the investigators. Because UH keeps twisting my words I will disclose the full Memo in court when this matter is litigated.

*Beginning of 2-26-23 Faculy Memo Created BEFORE I got the Notice of Investigation. I am willing to swear under oath that the selected excepts from a memo I wrote, cut and pasted below, was drafted by me on February 25 and 26, and the entire Memo was to be sent the following day, February 27, to the faculty over the listserv.*

*Dear colleagues: In the interest of open dialogue, I am sharing a draft outline of a piece I'm working on for our faculty and WSRSL faculty archives. It also addresses the issues a few of you raise in your email chain.*

7

*I have almost reached the regrettable conclusion that the Negro's great stumbling block in the stride toward freedom is not the White Citizens Councillor or the Ku Klux Klanner but the white moderate who is more devoted to order than to justice; who prefers a negative peace which is the absence of tension to a positive peace which is the presence of justice; who constantly says, "I agree with you in the goal you seek, but I can't agree with your methods of direct action"; who paternalistically feels that he can set the timetable for another man's freedom; who lives by the myth of time; and who constantly advises the Negro to wait until a "more convenient season." King, M. L., Jr. (2018).* Letter from Birmingham Jail. Penguin Classics.

---------------

In Robin DiAngelo's book Nice Racism, How Progressive White People Perpetuate Racial Harm (Beacon Press Boston, 2021), she discusses a study of racial activist burnout conducted by educational researchers Paul Gorsksi and Noura Erakat. (When DiAngelo uses the word white liberal, I also include all non-Black American people (NBAP) at this Law School [and those] who were born Black but not raised in the U.S.[2]

> **Participants also attributed their burnout to white [and NBAP] activists asking them to temper their emotions. Responding with strong emotions to injustice is, of course rational. But the passiveaggressive, conflict-avoiding culture of niceness, along with the looming threat of triggering white [and NBAP] fragility, puts enormous pressure on the activist of color not to show emotions that make white [and NBAP] people uncomfortable. One participant described how, despite pressure from white [and NBAP] activists he worked with, he could not temper his emotional response to injustice:**
> **"This [victim of racism] could have been me: this could have been my kid." This participant explained how exhausting it was when "wellintentioned, progressive [white and NBAP] people who think**

---

[2] This is not a slight at our Dean or any other Black faculty not born and rasied in the U.S. As Drs. Mamie and Kenneth Clark, studies showed in *Brown v. Board* that as result of segreagation most Black children preferred white dolls to the Black dolls. The children would say that the black dolls were bad and the white dolls looked most like them. To the Clarks, these tests provided proof that segregation gave Black children a sense of inferiority. That sense of inferiority would last the rest of their lives. (A subsequent study in 2005 showed that nothing has changed and the effect of segregation still has Black children believing the color of their skin makes them inferior to whites). So when I discuss Black Civil Rights the effects of racism in the U.S. is unique to the Blacks who were born and raised in the U.S, This also reinforces the understanding that there is no monolithic Black experience.

*they are lovers of justice consistently policed his emotional responses to racism.*

*Many activists of color felt that the racism coming from the white [and NBAP] activists compounded and made more painful, frustrating, and debilitating the racism of white [ and NBAP] people not necessarily identified as "allies".*
Id. P. 46-48.

Diangelo goes on to provide telltale signs that expose unconscious racism.

*The idea that there is a choir of enlightened, racially aware white [amd NBAP] rests on the idea that racism is a simple formula: conscious prejudice + intentional meanness = racism, or individual malicious intent across race. A racist, according to the criterion, is a person who doesn't like people based on their race, knows this, and intentionally seeks to harm them. This definition beautifully protects systematic racism by exempting virtually all white people and [the NBAP]. The vast majority of racist acts perpetuated daily by white and [the NBAP] are neither conscious or intentional. Even if these acts were, it is very difficult to prove intent, and a rare person who would admit that their motives were less than pure.*

*The workplace is particularly rife with unconscious racism. These acts include the following:*

- *Talking over and silencing BIPOC people in meetings*
- *Leaving BIPOC out of loops*
- *White and [NBAP] solidarity in the face of [Black] racism*
- *Relentless pressure on Black people to keep white [and NBAP] people comfortable, including pressure to modify their hairstyles or speech patterns*
- *Inequities in promotion.*
- *Double standards in what emotions can be expressed and by whom.*
- *White [ and NBAP] women weaponizing their emotions so that any feelings of racial discomfort around a colleague of color become an H.R. issue for that colleague*
- *Over-scrutinization*
- *Gaslighting*
- *Punishing BIPOC people who challenge racism.*

9

*Id. at pp. 37-38.*

*Let's see how accurate Diangelo's unconscious racism acts are by applying some of them to the latest anti-Black racist act done at the WSRSL*

- ### *Talking over and silencing BIPOC people in meetings*

*I am the only Black faculty member born Black and raised in America. I have been involved in the Black Civil rights movement since I was 5. I was angry and hurt at the meeting as I tried to explain why excluding Black civil rights attorneys, activists, and Black Law students was hurtful and racist.*

*When I brought this issue up at the meeting, I directed my questions to the Diversity and Equity Committee. Camille has undoubtedly faced her own share of racism. But she was born in Jamaica and went to school in Canada. She did not grow up in America as a Black person during the height of the Civil Rights movement, which is specifically what Dr. King's letter was about. She kept interrupting me, and I repeatedly said, "let me finish" or "stop cutting me off." To silence me, she stated dismissively that it was a mistake not to include Black civil rights leaders and attorneys, but we needed to move on and she kept saying okay, Ken, where do we go from here? She seemed to want to start the faculty hiring meeting, implying that it was more important to start the meeting, than to discuss the harm caused to our Black law students and me caused by the systemic racism that our Black students and I were feeling. The attitude from the Law Dean and others completely minimized the harm this racist act caused black people at our law school. The Law Dean caused more pain when she tried to equate my Black experience pain with her own experiences. This was extremely upsetting and disrespectful to my grandparents, parents, and family, not to mention the millions of other Black folks who grew up in America's racist system and actively fought for Black Civil Rights. It was akin to a man telling a woman victim of rape that he knows how she feels and everybody has "gone through something, so why are you making big deal out it?. Our risks and sacrifices were done at great physical, professional, and emotional risks.*

*Some you believe that you are "woke" to the pain of the Black race because you are of color or a liberal white. You have researched or read books that you equate knowledge to experience, wrongly believing that it gives you the right or privilege to judge Black racism through your non-Black eyes, your non-Black experience. You then seek to tell me how I should act or feel as a victim of anit-Black racism. Some of you made the same accusation you are making now when thing a few years ago when you accused me of being too angry after I had to stare at monkeys in a suit at a law school*

*job talk. Some said I should not have been so blunt and angry during the meeting. Some of you still believe you are better suited when it comes to racism to interpret how Black Law Students and I should react to this specific incident of racism. Ironically, Dr. King was driving at this in his letter to the moderate whites who told him that his direct action of confrontation made people uncomfortable and angry; therefore, direct action protest was not the right to demonstrate racial change.*

- ***Leaving BIPOC out of loops***

*The issue was Black History Students,d Dr. King's letter from the Birmingham Jail and the Diversity and Inclusion Committee, leaving Black civil rights attorneys, Black Law Students and activists out of the loop and not having any as a facilitator.*

- ***Gaslighting***
  *Charlie says in his email that "I have also reviewed the Memo that Dina and Susan subsequently circulated, explaining how the February 23 event was conceptualized. Having read it, I suggest that the proposed Ground Rules should extend beyond meetings and include a procedure for expressing one's comments on Law School events." Charlie was sitting right next to me in the meeting and heard every word.*

*When I raised the issue of why no Blacks had been asked to participate, no one associated with this event provided the information that is contained in the Memo. Moreover, when I asked the Committee why no Black civil rights leader was asked to facilitate, Susan, who co-wrote the gaslight memo- looked at me and said "why are you looking me?" As if to ask, "why are you blaming me for this act" or why are you accusing me of causing this fiasco. The Law Dean once again jumped in, said it was a mistake not to invite Black Civil Rights attorneys or Black activsts and asked, "where do we go from here? No one from the Committee disputed the Dean when she said it was a mistake not to invite anyone. The memo makes no mention of "we made a mistake". Rather the Memo does a complete reversal and turns the event into a planned "book club". The Memo made it seem like the book club was the plan all along. From Friday through Tuesday, no one emailed the BLSA students or myself explaining the event. I sent my February 18 email to the Dean and the Committee the next day. No one responded to the email.*

*Having heard nothing other than this was a mistake, I called for a boycott of this disrespectful and this systematic racist event. The Law School ignored my verbal protest, so we needed to apply the pressure of direct action to force change. Dr. King*

discusses the purpose of direct-action protest in his letter from the Birmingham Jail. We called for a Boycott on February 21, 2023. Dina and Susan sent an email the next day, February 22, 2023. Unlike the Dean's unchallenged statement on Friday that "it was a mistake," this email now claims it was not a mistake. They had planned the "Bookclub" Black History event all along. This seems somewhat suspect and entirely disingenuous. It also created more harm as it seems to paint the Committee as victims while ignoring myself and the other black law students who have honestly and genuinely expressed how the Law School harmed us because of this event.

Finally, rather than admit that no Black person was asked to be a facilitator, the stated in the February 22, email that: **"as well as one of us who is Black—a descendant of both free and enslaved Black people from Puerto Rico".** What's troubling is, and I say this with all due respect and civility, a few years ago, this person told another colleague and me that she was Japanese and Puerto Rican.

After reading the email, we (BLSA and me) wanted to be sure that what she told me was true, so we researched her scholarship to see if she ever discussed her ancestry. We found a piece she co-authored on racial Civil Rights, Dismantling Civil Rights: Multiracial Resistance and Reconstruction, She and her co-author's state in a footnote that: **[t]o make this more concrete, racially, we co-authors are Americans of Japanese, Filipino, Asian Indian, Korean, Puerto Rican, Caucasian, Hawaiian and Chinese ancestry."** There is no mention of any of the authors claiming to be Black or African ancestry.


• **Relentless pressure on Black people to keep white [and NBAP] people comfortable, including pressure to modify their hairstyles or speech patterns**


The two emails regarding how I spoke followed our call for a Boycott email. Kapua, Carole, Linda sent the first one, and Charlie, with Mark (replying) sent the second one. I interpret them as code, and thus I have dubbed these emails the "Let's put that nigger in his place, Parts 1 & 2". Some of you are using Camille as the reason for your "Let's put that nigger in his place" email; You hate it when I speak out passionately about and against anti-Black racism at this Law School. Colin Kaepernick was hated for kneeling during the National Anthem in protest of Black folks being killed by the police. Many of the racist comments pointed to how he should be grateful to live in a country where he can make millions and how dare he disrespect the country that allows him to have such a great life. Some of you display the same attitude towards me, a former drug addict, excon, disbarred lawyer, you don't belong here which is why you should be grateful for this Law School having hired me, so stop complaining and show some gratitude." No

12

*doubt, I am grateful to this Law School for giving me a second chance, I was born with a fighting spirit, and my upbringing has always been fighting for Black Civil Rights. I am grateful to for the opportunity, I've earned the right not to stay silent and passive when I see and experience anti-Black racism at the Law School.*

*Look at the email chain sent by Carole, where she, Linda, and Kapua lie on me by claiming I was name-calling at the meeting, which is not true. Still, when I responded and said it's a lie, Kapua sent an email about Kapu Aloha, as if to say that my response to someone lying on me should be toned nicely and said with aloha. In your emails, you imply, whether you are aware of it or not, that when the Law School engages in antiBlack racism against Black law students and myself, I am precluded from vocalizing our anger and pain passionately. You can determine if I'm entitled to feel and display righteous indignation when protesting anti-Black racism. In college and Law School, we engaged in HEATED arguments about race and law. When discussing gender discrimination, heated arguments often happen across our campus, but when discussing the "woke" and anti-Black racism, passion, and heated arguments are not permitted.*

*Here is how I read the emails: First, you get to determine if the act I am protesting about is/was racist. Those coming for me always conclude it was not. But, if you find it's racist, then you get to decide, from your non-black life perspectives, is it a big deal? If yes, you get to decide further what level my pain should be and whether my tone of voice and anger is proportional to the harm (if any) inflicted by the racist act.*

- ***White [ and NBAP] women weaponizing their emotions so that any feelings of racial discomfort around a colleague of color become an H.R. issue for that colleague***

*See the "Let's Put the Nigger In His Place, Part I" email and the attached letter that Carole, Linda, and Kapua sent. A cursory review of the attached letter from my nonBlack colleagues makes this a no-brainer.*

### *I Am Not Your Problem*

*I know that right now, it looks like I'm the problem and you can keep believing that if you so choose. However, since we called for a Boycott, I have received emails from our law students and other law groups where at least 75 of our students agree that there is systemic racism at this school. But, more importantly, they believe that the Law School ignores their legitimate complaints about it. I realize that some of you will not be able to take an honest look at yourselves in the mirror to see what part, if any, you have played in the anti-Black racism events I described above, but I assure you Black folks in*

*Hawai'i experience racism, and some of you "woke" people have unconsciously been a part of it at the Law School.*

*In his short piece entitled "To be woke, you must be awake: a critical response to white liberals, Cleveland Hayes discusses how those who think they are "woke" hinder Black progress, especially when Blacks challenge their wokeness.*

*I do not apologize for our blunt indictment of Whiteness and White "wokeness." After all, racism is a correlate of democracy (Cone, 2004; Delgado, 1999). When the immensity and depth of the physical and psychological violence continually committed against minoritized peoples is considered, the majority of it by nice people, we realize that the cost in suffering and lost lives is too high to keep tiptoeing around whiteness and trying to appease and placate White people with velvet gloves. I also realize that "[w]hat societies really, ideally, want is a citizenry which will simply obey the rules of society. If a society succeeds in this, that society is about to perish.* **The obligation of anyone who thinks of [herself or] himself as responsible is to examine society and try to change it and to fight it – at no matter what risk and this is the only hope society has. This is the only way societies change" (Baldwin, 1963, cited in Wise, 2005, p. 61). Therefore, for democratic education to be realized, we must work together to abolish, rather than ignore, whiteness.**

**Cleveland Hayes (2022)** *(Bold emphasis added): To be woke, you must be awake: a critical response to white liberals, International Journal of Qualitative Studies in Education, DOI: 10.1080/09518398.2022.2061741*

### Conclusion

**"I know where I'm going, and I know the truth, and I don't have to be what you want me to be. I'm free to be what I want." Muhammad Ali**

*The WSRSL faculty can pass as many rules as they like to try and regulate the content of my speech and how I speak when protesting anti-Black racism. I believe in justice and equality for all races, but my dedication- my 100% devotion-is to my race, the Black race. If the faculty has learned anything about me, they should know this, I fight like hell for justice for all people. As long as there is a 1st Amendment to the U.S. Constitution, I will always be vocal, blunt, and passionate when speaking out against racism anywhere.*

*End of 2-26-23 Memo to Law Faculty*

In the email I drafted on February 26, I quoted the letter from Dr. King's letter from the Birmingham Jail. Dr. King mentioned a moderate white person who says "I agree with you as to the goal, but not the method of action." I listed examples of "nice racism" from D'Angelo: talking over and silencing Black people in meetings; leaving black people out of the loop; relentless pressure on Black people, including pressure to modify hairstyles or speech patterns; over scrutinization; and punishing Black people who challenge unconscious biases. I explained in my email that the DEI committee engaged in each of these things.

During the February 17 meeting, I explained why this event was so offensive to Black people who had been in the Civil Rights movement. Dr. King came to Birmingham at Rev. Shuttlesworth's request. When Dr. King got there, he got locked up. The people who were criticizing him were the liberals who said they agreed with Dr. King, but not the way he was doing it.

When the BLSA students and I engaged in the same kind of protest, I'm punished. I think that is hurtful.

Returning to the allegation of misogyny, not one male person said anything during the meeting. I responded to Dean Nelson and Carole Peterson's comments because they interrupted me and made some racist and racially insensitive remarks, but I wasn't talking to them, I was asking the DEI committee the questions I mentioned above. I then spoke about the Black Civil Rights Movement, King's and Shuttleworth's history to Birmingham and my family and my history to the US Black Civil Rights movement, and my history with marching and protesting with Rev. Shuttlesworth. Again, concerning Camille and Carole, I responded to all of their comments at the meeting and I responded to the email chain lying on me. I'm accused of creating a hostile work environment because they did not like my responses or my tone when I responded to their speech.

As I said earlier, when I began speaking (after being given the floor by Camille) I was looking at the Chair of the Committee and asking my questions. The Chair asked me why I was looking at her. I said that someone on the Committee needed to answer my question. Then Camille jumped in and said, "Ken, we made a mistake." She said "as a Black woman, I can understand [discrimination and racism]I told her that she wasn't from here (U.S.) and she did not grow up here (U.S.). I was not saying she hasn't experienced racism or discrimination, but she didn't grow up in the U.S. Black Civil Rights movement which is what the Black History Month event was about. To me, her statement is akin to a man telling a female rape victim that he knows how she feels because everyone has had some sort of bad thing happen to them. I have to put it like that because if you aren't Black and were not actively involved in direct action protests and the Civil Rights movement, you wouldn't understand why this is so offensive. So I use the rape victim as an example. When I was a child we got bussed to schools where

my first name given to me by white students was "nigger". I recall telling a teacher that my white friend Stanley called me a nigger and the teacher's response was "don't bother me, go back and play." I was not allowed to go on most field trips, I had to stay back in the library. I also was placed in the special education section; even though I was more intelligent or just as intelligent as the white students.No one on the faculty, including Camille, experienced the type of racism during the height of the U.S. Black Civil Rights movement.

The investigators are unfamiliar with my story, but most of the Law School faculty is familiar with this part of my story. My life started with Jim Crow Racism. My mother (Stella) was white(Italian). She was the youngest of 9 children. When she got pregnant by a Black man, her oldest brother broke her collarbone at the dinner table, and her Catholic family placed her in Longview Mental State Hospital for the Insane to give birth to me. I was born in that state mental hospital, taken from my mother, and placed in Catholic Charities Orphanage in Cincinnati. I finally found and met my mother for the first time a couple of years after I started practicing law in 1991. My mother was living in a halfway house for the mentally ill in downtown Cincinnati, just a couple of blocks from the Law Firm I was working at. She had undergone almost a decade of shock treatment after giving birth to me. She spent a little over ten years of her adult life locked up in that Asylum and the other half living in halfway houses for the mentally challenged. She named me Tony when I was born. I did not know this until I found her and told her I was her son. She called me Tony until she died a few years later. My mother's life was turned into a living hell simply because she was White and my father was Black, and she was adamant about carrying me to term. It was illegal for my Black parents to adopt me because I was listed as white on my birth certificate. Jim Crow laws would not allow Black people to adopt White babies. So I had to stay in the orphanage for two more years until my birth certificate was legally changed to say that I was not white but Black. The Archdiocese of Cincinnati swore that I was Black to a probate Judge, and presto, I went from being born legally white to lawfully becoming Black. I have the documents to prove all of this. The point is, Jim Crow laws have affected my family since I was conceived in my mother's womb. It destroyed my White mother's life as she spent over ten years locked up in that place, subjected to all kinds of cruelty and brutal treatment. I read her medical records at the probate court when searching for her in 1990/91. So yes, I'm passionate about the Black Civil Rights Movement, and for Camille to say that she understands the pain of Jim Crow laws simply because she is Black was an insulting and uncaring thing to say.

On February 18, 2023, I sent the email I sent to Camille and the DEI committee to a few colleagues. One colleague responded that he thought I was justified in what I said. He pointed out how the Chair and Camille handled my questions and statements. He wrote:

> **[P]articularly given the silence of the DEI committee members and in**
> **light of the defensive remark made by its Chair, without addressing**
> **the point I thought you made very clearly—I personally thought your**

16

**anger was justified…Likewise, Camille's inartful attempts to shield committee members (whether from embarrassment or as a substantive matter) raised further questions in my mind. Further silence on the matter would be revealing in and of itself.**

**Email from a faculty member, 2-19-23.**

During the meeting and shortly after, I got several emails and texts from colleagues apologizing for the pain the DEI's Committee's racist event caused me, a student during the meeting was in tears after hearing my hurt, and apologized for the pain this racist incident caused me. I will also be able to authenticate these in court. A faculty member also apologized for the pain this incident caused. The complainants claim I spoke from rage, whereas others saw me speaking from the pain the Committee, Camille, and Carole had caused by their insensitive and racist statements.

No one disputed the facts as outlined in my email to Camille on Saturday, February 18. No one responded to that email, claiming that I had lied in the email about what she, others, and myself said at the meeting. In fact, no one disputed what happened in the meeting. The email I sent to Camille went out on the call for the Boycott. Afterward, Kapua, Linda, Carole, Charlie, and Mark sent emails. Not one person in those emails said that what I said happened was a lie, nor did they claim in their emails that I was physically threatening anyone. Kapua, Carole, and Linda made the false claim that I was name-calling, but no mention of me physically or verbally threatening anyone. I didn't get notified of allegations that I threatened physical harm until I got the Notice of investigations.

I did not mention this article written by Tess Martin when being interviewed. However, if I had remembered it, I would have read it to the investigators during my interview because it captures what many Black people, including me, have to deal with when responding to racist acts or speech. It's quoted in DiAngelo's book "Nice Racism," and I have cut and pasted it below. Black Feminist writer Tess Martin defines "Tone Policing".

> **Tone policing describes a diversionary tactic used when a person purposely turns away from the message behind her interlocutor's argument in order to focus solely on the delivery of it…**

> **White person ["W.P."]: Wow, you are surprisingly well spoken!**

> **Person of color ["P.O.C."]:  For a black person, you mean? That's really insensitive and I can't believe you thought you had the right to say that to me.**

W.P.: Why are you so upset? I just gave you a compliment.

P.O.C.: Do you not even realize what you said and how racist it is for white folks to pat black folks on the head for 'speaking so well'?

W.P.: You need to calm down. No one is going to listen to what you have to say if you're this angry about it. There's no reason to attack me over nothing. Have you considered the fact that you could be overreacting to this?

I've had a similar conversation to the one above multiple times in my life. It's aggravating, but it's also classic tone policing at work. By laser focusing on the emotions behind what the person of color is saying, the white person is able to move the conversation away from her own inappropriate conduct and back onto the P.O.C. In this way, the problem ceases to be the racist comment and instead becomes the P.O.C.'s reaction to it.

The suggestion that you can't deliver a razor sharp argument against racism unless you employ a chilly brand of academic detachment from the subject matter is pure bullshit. Being subjected to any form of injustice is infuriating. The last thing I want to hear from someone who has just said or done something completely out of line is how I need to check my emotional response to it. But tone policing works so well as a defense mechanism because it renders a perfectly legitimate complaint irrational, especially when the offending individual maintains his or her own saintly calm. If you can successfully shut another person down based on her anger or frustration, then you don't ever have to answer for your own racist conduct. And, bonus, by remaining cool as a cucumber, you appear to be in the right to those around you, especially in comparison to the irate person you just insulted with your belittling behavior.

**It's pretty fucked up, right?...**

*https://tessmartin.medium.com/racism-101-tone-policing-92481c044b6a*

The investigators asked me about my attending the meeting in person and not on Zoom as I had done since the pandemic. Before the pandemic, I attended faculty meetings in person. I didn't attend faculty meetings in person during the pandemic and afterward.

This was a special faculty meeting and it occurred on a Friday, not the normal Wednesday times. Normally, I work from home on Fridays, but on February 17, I had a dentist appointment, so I planned to go to the faculty meeting and then to the dentist. UH is closer to Kahala than my house is. Because I didn't know how long the meeting was going to last, I wanted to shorten the travel time from the law school to my dental appointment. I attended the meeting in person because I had a dentist appointment, but I also wanted to address the DEI committee about this racist event in person. So the most complete answer I can give to this question is I attended in person for two reasons. I had a dentist appt and wanted to speak on this political and racist issue in person. However, I would have said what I had to say over Zoom or in person. It didn't matter. I can provide my dental records showing that I had an appointment, and I attended the appointment and then zoomed the rest of the faculty meeting. But I'm still not sure why this matters. I'm free to attend the meeting in person or on Zoom. Like I said, I speak my mind no matter where I am. I could be wrong, but I think most of the faculty would agree with this statement.

The investigators asked me why I refer to myself as an FBA, Foundational Black American. I was born and raised in the United States during the height of the Civil Rights Movement. Anyone born in the United States who can trace their ancestry back to slavery is a "foundational Black person." There is a movement seeking reparations from the U.S. government for slavery. Those who would be entitled to reparations are those who can trace their roots in the US back to slavery. I brought this up because Camille kept interrupting me and saying that she understood how I felt because she is a Black woman. Her insensitive comments disparaged the Black Civil Rights movement. I told her I was the only foundational Black person at the law school. Not all Blacks are the same and share the same history. My point is that not one of the people in the faculty meeting had been involved in the U.S. Black Civil Rights Movement. Camille gave me the floor, and she kept interrupting me. The Notice of Investigation claims I was interrupting her. This is false.

When Camille interrupted me and told me she understood what I was going through because she, as a Black woman has been subject to discrimination—I can only explain my pain with an example. It was as if a female had told a man she got raped and it was a horrible experience, and the man saying that they understood because bad things happened to men too. Her statement was offensive and insulting to those of us who had been on the frontlines of the U.S. Black Civil Rights Movement. When I speaking of Black pain, the DEI committee ignored it.

Again, I used the term "Nice Racism" to refer to unconscious bias. Mind you, I'm sitting in a meeting with a bunch of legal scholars citing scholarship that supports the point I was making. Now they claim I was name-calling. When Carole Petersen looked at the flyer and said she didn't see anything racist about it. She went on to say that Black people could come to the event and say what they wanted to say. I told her that was an example of "nice racism." Here you have a white person saying that based on her

experience, the flyer is not racist. Thus, my opinion that it is racist must be wrong. I'm overreacting, and I'm being too sensitive. She spoke as if she had the privilege to tell Black folks that what we experience is not real because from the privilege and view as seen through her white eyes, the event is not racist. My response was to her racist and insensitive comment.

The Notice insinuates that I used the term "woke" in a derogatory way. This is another example of my words being twisted. Our law school prides itself as a liberal institution, but they can't see their own implicit bias. The term "woke" originated in the Black community in the 1940's. It was revived in the late 60's with the Black Panther Party for Self-Defense as the police were killing Black men and women. It was then made popular by Erykah Badu in 2008 and again when George Zimmerman stalked Trayvon Martin, who was only armed with a bottle of tea and a pack of Skittles. Zimmerman killed the Black teen, and an all-white jury acquitted him. Stay woke to racism.

I asked the DEI committee why they hadn't invited any Black people to be facilitators. Camille said it was a mistake and asked me where do we go from here. No one said that they planned it like this on purpose. When I sent out the email to Camille and the DEI committee the next day, no one responded that they were going to change the event. They didn't say anything on Sunday or Monday. So, I did what Dr. King would have done and called for peaceful, non-violent, direct-action protest. The purpose of a Boycott is to bring about pressure to get change for racial equality, not just to be raising hell. After I sent the email asking for a boycott, DEI committee members Dina Shek and Susan Serrano responded with their Gaslight email, claiming the event was planned like this from the beginning. This is an example of the gaslighting that DeAngelo refers to in her book as an example of unconscious racism, "Nice Racism" in the workplace.

I used my 1st Amendment right to protest to raise my concerns. I didn't receive any emails saying I was creating a hostile environment until after I called for the protest. No one on Friday, Saturday, Sunday, Monday sent any emails asking for new rules and alleging a hostile work environment. It was not until after I called for a boycott that the emails from the faculty members started coming. It wasn't until after I called for a Boycott that the DEI committee finally sought fit to explain the event, which differed from Camille saying it was a mistake not to invite any Black people as facilitators.

On the morning of February 22, the day after, I called for a Boycott, but before the Gaslighting email was sent, I had a telephone conversation with Justin Levinson on the phone. I told him that the goal of the Boycott was to change the event into something meaningful for our Black Law students and students in general and we could call in some Black community members or Black law students to be involved in the event. That we could bring in Dr. Akemi Glenn to discuss what it's like to be Black in Hawai'i and how we are often ignored and experience racism. I told him the Committee probably would not listen to me since I called for a boycott, but they would listen to him. The purpose of the Boycott was to bring change, not raise hell. Justin said he thought it was a good idea and he would reach out to the committee members and get back with me.

Before he could get back to me, the two DEI committee members sent their "Gaslight" email and said this was a planned event and was supposed to be a book club type meeting. My goal was to help change and educate the student body and faculty on Blackness in Hawaiʻi and anti-Black racism in Hawaiʻi.

Charlie Booth was sitting right next to me at the meeting. He sent an email that he had reviewed the [Gaslight] Memo Dina and Susan subsequently sent and proposed that ground rules apply beyond faculty meetings and events. I can't say it enough, the Memo that Susan and Dina sent afterward was gaslighting. It made it seem like the book club was the plan all along. No one sent me anything to explain the event after I called for a protest. Rather than listen to the pain they caused by excluding Black Law students and Black Activists from the panel, they doubled down and did what DiAngelo predicted, engaged in Gaslighting.

I don't know what the term "not non-violent" or "non non-violent" means. I don't call recall using this term. The Notice of allegation says "*Both in the meeting and in subsequent emails after the meeting, you utilized words perceived as veiled threats, such as informing meeting attendants, students and staff via a listserv that you were not non-violent.*" The email speaks for itself. I did not use that term. In the meeting I gave the history of my and my family's involvement in the Civil Rights movement. I have uncles that were part of the Black Panthers. I follow the teachings of Malcom X and the Black Panther Party for Self-Defense. Some of my relatives are belong to the Nation of Islam. Beginning in the late 60's until I moved to Hawaiʻi in 2008, I attended countless protest strategy meetings. Before our protests, marches or boycotts would happen, there were always heated meetings about how we would protest. The Black Panthers were peaceful. They wouldn't hit anyone unless someone hit them. I and many other protestors like me, did not believe in the turn the other cheek after being hit or beaten while peacefully protesting. Like Malcolm X said, "I'm non-violent with those who are non-violent with me." But I believe in self-defense, not turn the other cheek. Again, the Notice of Investigation claims I "utilized words perceived as veiled threats, such as informing meeting attendants, students, and staff via a listserv that you were not non-violent." Read the email calling for a Boycott and show me where I issued a veiled threat of violence. I fail to see how discussing my past history of the civil rights movement and talking about the Black Panthers Party for Self-Defense, SNCC, and Malcolm X are veiled threats of violence.

The late great Native Hawaiian activist Haunani-Kay Trask, while earning her degree in Chicago, actively supported the Black Panther Party for Self-Defense. I will not apologize for speaking about my right to defend myself when being attacked while peacefully protesting. I was 5-6 years old when peacefully marching with my family after Dr. King was killed only to see a police officer beat my mother with a billy-club. My aunt took me home, and the police took my mother to jail. I also told the faculty this part of my Black Civil Rights history. One of the emails I received from another colleague shortly after the meeting said, "*Thank you for sharing this email and for your manaʻo on*

*Friday.  These painful truths and experiences are what is often missing when talking about what has happened in the past and I thank you for sharing.  The stories you've shared about your life, I've never heard.  But I could feel your deep pain.  I'm sorry that this event forced you to relive this pain."* The emails from some of my colleagues are important because they prove that I was not in there yelling and screaming, calling people racists and going batshit crazy as implied in the Notice of Investigation. I taught and educated those on why the Law School's Black History Month Black Civil Rights Event was racist.

I even explained in the meeting and in my letter my relationship with the late Civil Rights leader, Rev. Fred Shuttlesworth. This is where there was a discussion of my not believing in King and Shuttlesworth's " turn-the-other-cheek " teachings. Many of us believed in self-defense. One of the many protests I did with Shuttleworth occurred in 1997. There is a picture I sent with email and Boycott email of Shuttlesworth speaking before the protest, and I'm standing near his side. I represented a young man who was locked up in a psychiatric hospital. He escaped from the 7th floor. 15 police officers surrounded him in a yard. He picked up a brick, held it over his head, and the police shot him several times in the scotum and other places, killing the mentally challenged Black man. We started protesting to get the City of Cincinnati to have a mental health unit to respond to these situations. We had a protest called the "Brick City Hall" protest. Shuttlesworth was with us, and we told him he should carry a brick, but he didn't want to appear violent. I explained to the faculty how the pre- protests meetings that we hold in the basement of churches would get heated. In fact, if you go back and research the direct-action protest in Birmingham, Dr. King, and Rev. Shuttlesworth didn't agree on how to end the protests after King was arrested in Birmingham and wrote the letter from the Birmingham jail.

Dr. King wanted to leave Birmingham after he was beaten up and concede certain demands to end the Boycott and protests. Shuttlesworth didn't let him leave. Meetings were heated. I told the faculty that I didn't believe in turning the other cheek. I believe in self-defense. My uncles and aunts were Black Panthers. But I was talking about protests from 30-50 years ago. Now some of the faculty want to twist what I was saying. No one in the meeting called for security or the police. No one stopped the meeting or told me to stop threatening them. No one in the meeting said, calm down, Ken or Ken, don't name call or Ken, we feel scared. After I spoke, Camille asked if everyone was now prepared to proceed to the hiring portion of the meeting. Everyone said yes, and the meeting lasted another 4-5 hours and went on without interruption and without any faculty members having to leave because of my speech. No one called for new faculty or listseve rules, or claimed that I "could create a hostile work environment" after the meeting, that weekend, or that Monday. It was not until AFTER I called for a boycott on Tuesday and publicly exposed the DEI committee's racist event and the racially insensitive comments Camille made at the meeting that the emails and false accusations began to fly.

It's also important to point out that the email that Carole, Linda and Kapua sent out on February 21, 2023, hours after I called for a Boycott on the listserve, had a memo attached to it. The memo proposed that the faculty should adopt ground rules for faculty meetings. In this Memo, they DO NOT claim that my behavior at the 2/17/23 faculty meeting created a hostile work environment. What they say is that:

> We fully recognize Ken's right to express his views at faculty meetings. However, Ken also has an obligation to treat our Dean and all colleagues with respect and to refrain from name-calling and other abusive language and behavior that could create a hostile and intimidating work environment.

Keep in mind this email came hours after I sent the Boycott email on the listserv on February 21. The following day, February 23, the Gaslighting email from Dina Shek and Susan Serrano was sent to the listserv. The student responses on the email chain supported the Boycott, so the Gaslighting email made them look worse. Then after the public became more aware of the racist event, it could be argued that something had to be done about me. So the alleged behavior that "could create" a hostile work environment stated in the 2-21-23 Memo now becomes the behavior that did create a hostile work environment stated in the Notice of Investigation. As I said in footnote 1 and the conflict letter sent to UH counsel, this is First Amendment Retaliation--Bruno, Camille, and Osorio reached their decision before this investigation began.

After I was allowed to speak, I did not raise the issue again in the meeting, which lasted several more hours.

On a scale of 1 to 10 (1 being a whisper and ten being screaming at the top of your lungs), my voice was around a 6. I was not yelling at the top of my lungs. I was speaking in the tone of voice I use when I'm teaching. I don't have to use a mike. I'm naturally loud. I can also speak passionately about subjects. I used to try cases for a living before and after I got addicted to drugs. So I'm use to speaking loud and clear. It's how I speak to groups. During COVID, I posted many rants on Facebook, and my tone of voice was the same. My voice is the way it is. Not one person in the meeting told me to tone it down. If the argument is that everyone in the room was so scared they couldn't or wouldn't say anything, then I'm sure someone in the safety of their homes on Zoom would have said something. No one attending the meeting via Zoom told me to tone it down.

Years ago, we had a faculty meeting when individuals were invited to do a job talk. One of the individuals, a white man, displayed images of monkeys in suits in his PowerPoint job talk presentation. Another (former) Black female faculty and I were offended. When we were at the meeting to vote on whether the Law School should hire this candidate, we asked whether this individual was suited to be on the faculty because he wants to teach at a racially diverse school and is not sensitive enough to know how racially offensive showing monkeys in suits is to Black Americans. Some of our colleagues

brushed off our comments as overly sensitive, meaning that we shouldn't think the images were racist. Again, it's extremely offensive when non-Black people tell Black people we are overreacting to racist events. A few faculty members said we (not just me) were too sensitive and we overreacted. They dismissed our pain.

It is difficult for me to go through these questions and hurt, knowing those who caused the pain and engaged in the racist event have now made themselves victims and they did nothing to address the issue I raised..

Concerning threats over email. Where I said, "come at me all you want but don't lie on me." That's not a veiled threat of violence. It's akin to saying, "come after me all you want but don't lie on me." The late famous Black actor Lance Riddick has a popular quote: "If you're going to come at me, come at me respectfully, and I will respond respectfully." Again, the complainants twist my words to create the Angry Black Man Image. Concerning the allegation that I was name calling, common sense tells you that if I was in there calling people names, a faculty member in the room or on Zoom would have told me to stop calling names or, hey Ken you're out of line.

The Angry Black Man excuse and racist tropes was first used against a friend and me when I was in high school. The communities I grew up in, Lincoln Heights and Woodlawn, are Black communities right outside of Cincinnati. In the late 60's and early 70's, Lincoln Heights was the only 100% Black city in the U.S. We got bussed to the elementary school which was in a white neighborhood. When I got to high school, I played football. I also started a Black Student Union in high school that advocated for Black Civil Rights of students. One morning before school, in the high school parking lot, my friend almost hit a car that two white guys were in. My partner slammed on the brakes. The white guy called us a "niggers." My partner got out of the car and pushed him, and told him not to call him a "nigger." We walked into school and went to our classes. Later that afternoon, the principal, Dr. Atkinson, called me to the office and told me that they had suspended my partner for 10 days. I asked what happened to the white kid who called us "niggers." Dr. Atkinson said he had spoken to the white kids parents, and it was dark, and the kid was scared. Dr. Atkinson told me not to start a protest because I needed to understand that it was dark outside and the young white men, seeing two big Black football players, was scared, and that's why he yelled nigger. This man literally sat behind his desk telling me this bullshit. I offered Dr. Atkinson a challenge, "how about you come to my Black neighborhood at night and stand on the corner and when you see two big Black men walking by and you get scared, yell nigger." We are punished for the color of our skin and physical build, put that with speaking passionately, and it allows white people to call you nigger, police officers to shoot you, and colleagues to frame you by accusing you of threatening them and creating a hostile work environment. How did that story end? My best friend's father worked for the school district, so his parents did not want me to lead a protest over this racist "Black Scary Man" event. By the way, my best friend went to graduate from Columbia University and the University of Cincinnati College of Law.

24

I'm sure I used curse words during the faculty meeting, but I always curse. I NEVER curse at anyone. I curse when I teach. I cursed in the email I sent to the Committee and Boycott. I have cursed on panels sitting next to Judges. In 2017 the late Justice Ruth Ginsburg co-taught my Crim Pro class with me, and I cursed while teaching with her. Since I've been at the Law School, I've cursed in faculty meetings and while teaching classes and no one has told me that I was offensive nor has any students complained in the 10 plus I've been teaching.

The investigators asked me what do I mean when I used the term, "Educated Negros"- Curtis Mayfield was a singer during the Civil Rights era. He used the line "educated fools from uneducated schools." It's from a song called "If there is a Hell Below." Clarence Thomas is an "educated Negro" who says racism doesn't exist. Candace Owens would be another. She claimed George Floyd caused his own death. I don't remember saying "educated Negro" in this meeting. You can educate yourself all you want on the Civil Rights movement, but you can't get the experience if you weren't involved in the Civil Rights movement. In the email lettter I used it because I'm sure there will be some Black people, who want to help and protect Camille that will say, "No the event was not racist' or some who will say the event was not racist just to help Camille recover after from allowing this racist event to be planned in the first place. Being the first Black female Dean at our Law School, some Black people will come to her defense and say I was wrong. Like Malcolm X said, when speaking of his former leader Elijah Muhammad, "Wrong is wrong no matter who's doing it." The bottom line is they have a First Amendment Right to say what they want.

When I was talking in the meeting, I was sitting. My body language is the same whenever I speak. My birth mother was Italian ( I was adopted), so I use my hands a lot, but I never swung my hands with a closed fist like I was attacking someone nor lunged at anyone, stood over anyone, or violated anyone's space. Look at my youtube videos or my Facebook live videos, and you will see how I talk, no matter where I am or who I'm speaking with. Interview any of my students, pick your choice, and they will tell you that I move in class a lot. I was never a "podium" standing trial lawyer. I'm a passionate speaker and don't need a mike in my classes as the students can hear me clearly. My body language in this meeting was the same as it always is. It wasn't threatening. When you interview my accusers, ask each of them (without allowing them to speak to one another) to demonstrate the threatening gestures I made. Once you do this, please interview me again and demonstrate the threatening physical gestures they demonstrated to you so I can have the opportunity to respond. This vague but "dog whistle" language used in the Notice of Investigation reads like the police reports created after pollce shoot and killed unarmed Black men. I'm reminded of the Black male birdwatcher in Central Park  a few years ago who asked a white woman to put her dog on a leash, and while he recorded her, she told him that she can call the police and tell them that Black man is threatening her, and they will come and arrest him. She was encouraged to say this because most people believe Black men are violent.

I didn't know students were attending the faculty meeting when I was talking. They weren't on camera. I wouldn't have done anything differently if I knew students were attending. My students know that I don't mince my words. I teach blunt and I speak blunt. I didn't know until the student started talking about the candidate that she was there. The camera came on, and she was choked up and crying. She said she was so sorry about what I had been through. Another faculty member came on and apologized. The student was able to do her presentation.

My speaking style doesn't change when speaking to women or men. No man said anything to me during the meeting. I didn't say anything to Carole or Camille until they said something racist and insensitive to me, so I responded with speech. I wasn't talking to them. I only responded to them when they made offensive and racist remarks.

Regarding the email that called for a boycott, I drafted the portion of the email that I sent to Camille the DEI committee, on February 18, which was in red font. A BLSA student drafted the introduction to the email. I won't disclose the students' names because I don't want to put them in an uncomfortable position. Some of the BLSA students were worried that this kind of thing might affect their ability to graduate. I decided who the email would be sent to. I sent the email because racism and discrimination are a public concern, and I wanted the students, faculty, and others to Boycott the racist event.

I don't recall anyone telling me I was angry and sensitive. I was told that when we had the candidate who had the slides with monkeys in suits. I don't recall being told that after the February meeting. I was told that by one or two colleagues once during or after the faculty hire meeting where the candidate showed PowerPoint pictures of monkeys in suits. This was approximately five years ago. **[I recorded this interview. I was asked by the investigator "and the backlash you got is that you were told your sensitive and angry?" I responded, "I was told that once."]**

I occasionally raise issues of race in Hawai'i where I get some backlash. I have written articles for Civil Beat and the Star-Advertiser, where I speak on issues of race. I also do TV interviews regarding race in Hawai'i and police shootings of people of color. I get some negative comments from the public when I raise the issue of race in Hawai'i. Often, I am told I shouldn't be bringing race up, it's the Aloha State. That doesn't belong here.

Finally, I want to add a few things to my interview. First, the day after the faculty meeting, Saturday, February 18, 2023, and hours after I sent the email to Camille and the DEI committee, I saw Camille at a Black History Theatre Movie Event that same evening at the Doris Duke Theatre. I was with my wife—others from the Law School were seated right across from me. I said hello to Camille as she was walking up the aisle. She bent over (because I was seated), touched my shoulder, and asked me how I was doing. She then reached over me, extended her hand to my wife, and introduced herself. I was shocked to get allegations later that she views me as a threat. Again, no one said anything about my speech until after I called for a boycott days later.

Regarding misogyny, I have provided you with emails showing that I have raised discrimination and sexism claims on behalf of my white female colleague. I have advocated that she be Co-Director because few female attorneys practice habeas corpus law. All of the student workers I have hired over the years have been female. I have never had a complaint from anyone of them that I was engaged in misogyny. I teach very controversial subjects in Criminal Law and Evidence, especially rape shield evidence law and sexual offenses. I have never had a female student complain that I engaged in misogyny while teaching. Again, had a man said something as racially insensitive and hurtful as Camille and Carole said, I would not hesitate to respond in the same manner. I would have immediately responded if Charlie or Mark had lied and said I was name-calling in the meeting. My email to my female colleagues about the lie they told is clear. It's clear why I'm responding. I don't mention the proposed new rules; that's up to the faculty to vote on. I do object to the lie. I did not respond because they were female. I immediately responded because they were lying. I did not call anyone names.

Secondly, the Notices of Investigations contain dog whistle language that has been used for years to kill or injure Black men.

I have cut and pasted below some of the "Dog Whistle" language:

*You engaged in an abusive/hostile verbal attack on the Black History Month event and organizers.*

*You swore and yelled at, belittled and berated Camille Nelson*

*You utilized intimidating gestures, pointed and waved your hands at Dean Nelson, and slammed the desk*

*Both in the meeting and in subsequent emails after the meeting, you utilized words perceived as veiled threats, such as informing meeting attendants, students and staff via a listserv that you were not non-violent, and repeatedly inviting another faculty member who submitted a proposal for ground rules for future faculty meetings to "come at me";*

*Your threatening and belittling words and actions created an unsafe space for discussion and silenced the room;*

Since my speech at the Faculty Meeting on February 17, 2023, a similar incident occurred around May 18, 2023, between Rep. Marjorie Taylor-Greene and her Black male colleague, Rep. Jamaal Bowman. I have attached the article and would request it be part of my statement as it clearly illustrates why I believe some of my colleagues continue to engage in anti-Black racism by using their claim of a hostile work environment and misogyny as a pretext to retaliate against me for using "direct-action{ non-violent peaceful protest by calling for a Boycott of the Law School's racist Black History event.

Bowman is quoted in the article as saying:

> **Unfortunately this country has a history of characterizing Black men who are outspoken, who stand their ground and who push back as being threatening or intimidating," Bowman told reporters on Thursday. "So," he added, "she's not even using a dog whistle. She's using a bullhorn to put a target on my back, to the people that she refers to as MAGA people out there who might want to cause harm."**

He went on to say:

> **This is the same reason why Mike Brown was killed," he said, referring to the teenager whose 2014 killing by a White police officer in Ferguson, Mo., touched off protests throughout the country. "This is one of the reasons Emmett Till was killed," he added, referring to the 1955 murder in Mississippi that helped touch off the civil rights movement. "And throughout history, Black men have continued to be characterized as aggressive because, one, because of our skin color but, two, because we happen to be outspoken and passionate about certain issues.**

Bowman was blessed to have videos showing that he did not threaten Taylor-Greene as she claimed. Although I don't have videos, I do have emails and texts from some of my colleagues that refute the "dog whistling" language in the Notices of Investigation. The people who claim to be anti-racist and woke are now engaged in the same conduct that racists have used against Black men since slavery.

In conclusion, because the DEI Committee and Camille refused to change the event after being told on Friday, February 17, that it was racist to exclude Blacks from being facilitators, On Tuesday, I followed Dr. King's teachings and I called for a Boycott and brought my concern to the public for direct action protests. This embarrassed the DEI committee and the Law Dean, so they got pissed off and created these dog-whistling allegations as a pretext to punish me for exercising my First Amendment Right to Free Speech.

It's ironic and hypocritical for those faculty who bring this complaint against me when this entire racist event is about Dr. King and his letter from the Birmingham Jail. What makes it even more hypocritical is that they retaliate against me for exercising my First Amendment Right to free speech. Dr. King said the following about free speech in his *final* speech on April 3, 1968 (Dr. King was killed the following day, April 4, 1968.)

> "But somewhere I read of the <u>freedom of assembly</u>.

> Somewhere I read of the **freedom of speech.**

28

Somewhere I read of the **freedom of press**.

**Somewhere I read that the greatness of America is the right to protest for right."**

— The Rev. Martin Luther King Jr.

I have read the summary of my interview and it is accurate and complete.

*Kenneth Lawson*
_____
Ken Lawson

08-17-2023
_____
Date