# EXHIBIT 26

# HARRISON & MATSUOKA

*Attorneys at Law*

William A. Harrison
   E-mail: wharrison@hamlaw.net
Keith A. Matsuoka
   E-mail: kmatsuoka@hamlaw.net

1001 Bishop Street, Suite 1180
Honolulu, Hawaii 96813
Telephone: (808) 523-7041
Facsimile: (808) 538-7579
Web: www.hamlaw.net

July 26, 2023

*VIA: Email Delivery-jimon@hawaii.edu*

Shelton G.W. Jim On, Esq.
University of Hawaii
Bachman Hall 110
2444 Dole Street
Honolulu, Hawaii 96822

Dear Shelton:

Thank you for responding to our request to mediate and allow Professor Lawson access to the files. For us that is a major step forward and we look forward to working out the details. First, however, I want to apologize for some of the prior correspondence and for copying others on it. Although I have been practicing for 42 years and have represented students regarding allegations of student code violations, I have never been involved in this process. You and I have worked on cases in the past, so I hope you know me well enough to know my reaching out to the parties was not my intention to somehow go around you. My copying President Lassner, Provost Bruno, Dean Osorio, and Dean Nelson was not meant to violate the no-contact rule or to retaliate in any way, but instead to alert them to what Ken and I consider pressing issues and fiduciary responsibilities U.H. and the Law School have to the clinics' clients. That said, rest assured that I will not copy them on future correspondence.



Shelton G.W. Jim On, Esq.
July 267, 2023
2 | Page

There are several other secondary issues I would like to address in the hope of avoiding any future misunderstandings.

**HIP Background and Structure**

I understand the distinction you are drawing between conventional law firms and law school clinics, and I suspect what you've written may very well be literally true. Even so, that distinction strikes me as unrelated to the problem I was trying to point out. Nor is it necessarily in accord with the way court administrators and law school clinicians think and talk about the unique role law school clinics play in the delivery of legal services. For example, a recent U.S. News & World Report article about law school clinics quotes Krystal N. Lyons, general counsel and legal services director for San Bernadino County Superior Court and former professor at the University of La Vern College of Law, as saying, "A clinic is really a law firm at the school. You evaluate them the same way you evaluate a good law firm: Do they keep good data, do they provide service to the community, how many people do they service, do people know about them, do they have good metrics for evaluating student performance?" See Allen, "Legal Clinics: What Law School Students Should Know," U.S. News & World Report, May 19, 2023, at https://www.usnews.com/education/articles/legal-clinics-what-law-school-students-should-know. In short, though my description of Ken's clinics as law firms might have been less than precise, I hope you know I did not intend to mislead. I also hope it will not continue to confuse the point I was trying to make.

A brief review of HIP's history might help lessen any further confusion. It was founded in 2005, and I am one of the founding members. Since then, the students have always been supervised by volunteer attorneys. Following Professor Hench's retirement, Ken was appointed Co-Director along with Ronette Kawakami, a licensed attorney who continued to serve as the Law School's Dean of Student Services while also

serving as HIP's Co-Director. The Law School did see a need to hire an attorney to work full time in the clinic because the students had always been, and would continue to be, supervised by volunteer attorneys like me, who meet with them regularly, review their work, and give direction and guidance on their assigned cases. In addition to providing essential administrative services, Professor Lawson teaches the classes and provides necessary education as students perform the clinic's wrongful conviction/innocence work, such as by making sure they understand state and federal habeas law.

Another potentially important clarification is that the Law School did not hire Jennifer Brown because she was licensed, nor does the clinic require a full-time employee who is licensed to practice law. Shortly after his appointment as HIP's interim Co-Director, and at Dean Soifer's suggestion, Ken directed some of HIP's federal grant money to the Law School, which enabled it to hire Jennifer to perform the duties Ken had been performing prior to his appointment as interim Co-Director. Jennifer did not become licensed to practice law until several years later. Now that Jennifer is licensed, she helps supervise the clinic's legal practice, along with HIP's four volunteer lawyers.

Randy Roth worked closely with Dean Soifer to ensure that HIP met all ABA standards and complied with the Hawaii Rules of Professional Conduct. Because Ken is a disbarred attorney, Randy and Avi took extra care in making sure Ken's role was that of program administrator and chief educator. The practice side of HIP was designed to fall under the volunteer Co-Director, which, as mentioned, initially was Ronette Kawakami, then Randy Roth, and now Rick Fried. I described Ronnie as a volunteer because I am under the impression her compensation did not go up upon her appointment as HIP's Co-Director.

Shelton G.W. Jim On, Esq.
July 267, 2023
4 | Page

Again, I apologize if my less than precise description of HIP's legal status gave you any wrong impressions.

**An Office on U.H. Campus**

We did not realize, and were delighted to learn, that U.H. is apparently willing to supply Ken with an on-campus office, other than at the Law School. From our standpoint, that is wonderful news. To facilitate the working out of details, I would appreciate clarification as to the nature of what U.H. is willing to provide. For example, will students have access to that office so they can work on the files assigned by the supervising attorneys? Will U.H. also provide an on-campus classroom where Ken can teach clinic students in person? If so, would he also be allowed to teach the Evidence and Criminal Procedure courses there this fall? As you know, Evidence and Criminal Procedure are bar courses, and as you probably know, the practicing bar has expressed concern about the number of bar courses taught remotely in recent years. I happen to sit on an HSBA committee looking into that. While Ken has his own reasons for wanting to teach all his classes in person, I would think U.H. would have its own reasons for wanting that, as well. If appropriate facilities are not available on campus (other than at the Law School), Ken would be willing to meet Dean Mirkay at the Law School property line immediately before each class session and have Dean Mirkay escort him to class; and then escort him off the Law School campus after class has ended. If Dean Mirkay cannot do so, then perhaps U.H. security could provide the escort. Although this obviously would be somewhat humiliating to Ken, he would be willing to do it if necessary to provide students with in-person instruction.

**First Amendment Free Speech**

My current working assumption is that this matter will be resolved through accommodation and mediation, but I want to briefly comment on what you said about Ken's legal position. I believe you suggested that Ken's speech was not protected because he was not speaking as a citizen on a matter of public concern during the faculty meeting. As you

probably already know, the Ninth Circuit Court of Appeals recently protected a teacher's speech at a training session for teachers. See the *Dodge* case cited below. More importantly, I want to make sure you understand our contention that Ken speech at the faculty meeting was also protected under the academic freedom exception to the First Amendment. If Ken was speaking as a private citizen on a matter of a public concern, then, under *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568, 88 S. Ct.. 1731, 20 L. Ed. 2d 811, (1968) and *Dodge v. Evergreen Sch. Dist.* #114 56 F.4th 767 (9th Cir. Dec. 2022) Ken's speech is protected.

If Ken's speech falls under the Academic Freedom Exception to the First Amendment, as I believe it does, then he should prevail under *Demers v Austin*, 746 F.3d 402 (9th Cir. 2014), wherein the Ninth Circuit held that *Garcetti's* "official duty" test does not apply to teaching and academic writing performed pursuant to the official duties of a public school teacher or university professor.

We consider it highly relevant that Ken's speech to his faculty colleagues focused on matters about which he has written and taught extensively as a law professor. For example, while at the Law School, Ken founded the Hawai'i Civil Rights Project legal clinic; taught a variety of substantive courses that include civil rights law, explicit and implicit racial bias law, and civil rights activism; authored a University of Hawaii Law Review article on implicit/unconscious racial bias towards Blacks; been interviewed by local and mainland media on matters relating to the above-mentioned subjects, particularly the U.S. Black Civil Right movement; and served as faculty adviser for the Law School's chapter of the National Black Law Students Association ("NBLSA"), a nationwide organization founded during the U.S. Civil Rights movement to articulate and promote the needs and goals of Black Law Students.

Ken's speaking to faculty on why the flyer and event is unconscious racial bias is a matter of public concern. Ken's action following his speech at the meeting further demonstrates it was a matter of public concern. Ken memorialized what he said at the February 17, 2023 meeting, in his February 18, 2023 email to the Dean and DEI committee members. On

Shelton G.W. Jim On, Esq.
July 267, 2023
6 | Page

February 21, 2023, he and NBLSA called for a Boycott and used Ken's email from February 18, 2023, to call for a Boycott on February 21, 2023. This conclusively demonstrates that what Ken said at the Faculty meeting was of public concern.

The Ninth Circuit case law addresses your argument that Ken's speech to faculty was not a matter of public concern because he made it at faculty meeting. The Court recognized in *Demers* ([L]imited circulation is not, in itself, determinative.") The evidence of Ken circulating the February 18 email on the Law School Listserv when he and NBLSA called a Boycott, is evidence the 9th Circuit looks at in analyzing whether the speech was a matter of public concern. For example, in *Candelaria v. City Tolleson* 721 Fed. Appx. 588 (9th Cir. 2017) in finding that Plaintiffs speech was not a matter for public concern the 9th Circuit noted that the plaintiffs in the case "***did not attempt to publicize their speech beyond the fire department.*** *See also, Desrochers v. City of San Bernardino*, 572 F.3d 703, 712 (9th Cir. 2009) (Emphasis added) the Ninth Circuit noted that:

> We have recognized, however, that "[a] limited audience weigh[s] against [a] claim of protected speech." See Roe, 109 F.3d at 585; McKinley, 705 F.2d at 1114 (The result in *Connick* is also explained by the fact that the employee did not seek to inform the public about the operation of a public agency." The relevance of non-disclosure to the public tracks the Supreme Court's acknowledgment that "the public's interest in receiving the well-informed views of the government employees engaging in civic discussion: is one of the primary purposes of its First Amendment retaliation jurisprudence. Garcetti, 547 U.S. at 419. 'Public speech is more likely to serve the public values of the First Amendment. Private speech motivated by an office grievance is less likely to convey the information that is a prerequisite for an informed electorate." *Weeks* 246, F.3d at 1235. Thus, though "a

Shelton G.W. Jim On, Esq.
July 267, 2023
7 | Page

> private complaint may relate to a matter of public concern, our consideration of the form Desrochers and Lowes adopted to convey their message "help[s us] identify [whether their] speech…is of public concern…Because the speech at issue took the form of internal employee grievances *which were not disseminated to the public*, this portion of the *Connick* test cuts against a finding of public concern.

*Id.* at 714-15. (Emphasis added).

We believe the facts and law support that Ken spoke on a matter of public concern and "disseminated that concern to the public" via the Listserv. Given Ken's unique role at the Law School, as just summarized, I believe it would have been irresponsible for him not to object strenuously when Law School colleagues made clear their intention to stage a Black History Month event about the U.S. Black Civil Rights movement without any Black panelists. Try to imagine the uproar it would have created if the Law School tried to stage a program on native Hawaiian activism without including a native Hawaiian on the panel, or a program on antisemitism without including a single Jewish person, or on the AJA experience in Hawaii without including any AJAs? As a Black AJA, I cannot even begin to wrap my mind around any of those possibilities, including the one to which Ken objected and called for a boycott. Had I been in his shoes, I like to think I would have objected strenuously. Again, the Ninth Circuit Case Law protects robust speech on race and has held that such speech will very seldom constitute harassment:

> "[T]eaching and academic writing are at the core of official duties of teachers and professors. Such teaching and writing are 'a special concern of the First Amendment." *Demers v. Austin*, 746 F. 3d 402, 411 (9th Cir. 2014) (quoting *Keyishian v. Austin*, 746 F. 3d. 402, 411 (9th Cir. 2014) (quoting *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603, 87 S. Ct. 675, 17 L. Ed. 2df 629 (1967). Accordingly, the First

> Amendment robustly protects acts of public expression by academics on matters of public concern. "The desire to maintain a sedate academic environment...[does not] justify limitations on a teacher's freedom to express himself [or herself] on political issues in vigorous, argumentative, unmeasured, and even distinctly unpleasant terms." *Adamian v. Jacobsen*, 523 F. 2d 929, 934 (9th Cir. 1975). **Accordingly, the Ninth Circuit has stated that it "doubt[s] that a college professor's expression on a matter of public concern, directed at the college community, could ever constitute unlawful harassment" justifying judicial intervention.** *Rodriguez*, **605 F. 3d at 710. (Emphasis added)**

I do not intend to go back and forth over the caselaw with you as if we are in court. I cite the law in this letter so that you understand that we have a good faith basis in law and fact to claim that U.H. is retaliating against Ken for exercising his right to free speech. This investigation is chilling his speech, causing irreparable harm.

### Mediation

Although we believe Ken's speech is protected, a court battle over this will leave no winners. If Ken's speech's tone or volume was sharper or louder than some colleagues thought appropriate, that strikes me, and more importantly, Ken, as worthy of humble introspection. In that spirit, we request that mediation in this matter include Ho`oponopono.

Just for the record, Ken tells me he has always been willing to apologize to Camille. He did not intend to make her feel belittled, and it troubles him that she evidently took his remarks about nice racism personally. According to Ken, Camille approached him at a downtown public event the day after the faculty meeting and hours after he had sent her the email in question. While Ken was seated next to his wife, Camille approached him, bent down slightly, touched his shoulder, asked how he was doing, and introduced herself to Ken's wife. Several people from the Law School witnessed this interaction. Ken asked me to mention that

Shelton G.W. Jim On, Esq.
July 267, 2023
9 | P a g e

because he believes it reflects positively on Camille as a colleague and may help to explain his shock upon receiving the complaint in this matter.

Because the fall semester is almost upon us, we would appreciate a prompt response to our above-stated questions about details regarding an on-campus office and, hopefully, classroom.

Mahalo,

*[signature]*

William A. Harrison
Attach.
Cc: Prof. Ken Lawson